

2005 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

9-8-2005

# Zheng v. Atty Gen USA

Precedential or Non-Precedential: Precedential

Docket No. 03-3634

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2005

Recommended Citation

"Zheng v. Atty Gen USA" (2005). *2005 Decisions.* Paper 489.
http://digitalcommons.law.villanova.edu/thirdcircuit_2005/489

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 2005 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 03-3634
_____


ZHENG ZHENG,

*Petitioner*

v.

ALBERTO GONZALES,[*] ATTORNEY GENERAL OF THE
UNITED STATES,

*Respondent*


─────

On Petition for Review of an Order of the
Board of Immigration Appeals
(Board No. A72-500-941)


─────

Argued: February 7, 2005
Before: BARRY, FUENTES, and BECKER, *Circuit Judges.*

(Filed: September 8, 2005)


JOSEPH C. HOHENSTEIN (ARGUED)
1300 Spruce Street
Philadelphia, PA 19107

──────────────────

[*]Substituted pursuant to Fed. R. App. P. 43(c).

*Attorney for Petitioner*

PETER D. KEISLER
Assistant Attorney General
LINDA S. WERNERY
Senior Litigation Counsel
THANKFUL T. VANDERSTAR (ARGUED)
Trial Attorney
Office of Immigration Litigation
Civil Division
United States Department of Justice
P.O. Box 878, Ben Franklin Station
Washington, DC 20044
*Attorneys for Respondent*

MARY A. KENNEY
NADINE K. WETTSTEIN
American Immigration Law Foundation
918 F Street, NW
Washington, DC 20004
*Attorneys for* Amicus Curiae *American Immigration Law
        Foundation*

_____

OPINION OF THE COURT
_____

BECKER, *Circuit Judge*.

**Table of Contents**

I. Introduction  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

II.  Facts and Procedural History  . . . . . . . . . . . . . . . . . . . . . . . 4
        A. Background Facts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
        B. Zheng's Adjustment Application  . . . . . . . . . . . . . . . 5
        C. Removal Proceedings . . . . . . . . . . . . . . . . . . . . . . . . . 6
        D. Appellate Proceedings  . . . . . . . . . . . . . . . . . . . . . . . . 7

III. The Motion To Reopen Asylum Proceedings  . . . . . . . . . . . 8
        A. The *Lozada* Requirements . . . . . . . . . . . . . . . . . . . . . 9

  B. Prejudice . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

IV. Adjustment of Status . . . . . . . . . . . . . . . . . . . . . . . . 12
  A. The Statutory and Regulatory Framework . . . . . . . . 12
    1. Statutory Authority To Adjust Status . . . . . . 13
    2. The Eligibility Regulation . . . . . . . . . . . . . . 14
  B. The "Arriving Alien" Category . . . . . . . . . . . . . . . . 15

V. The Validity of the Regulation . . . . . . . . . . . . . . . . . . . 18
  A. The *Chevron* Analysis . . . . . . . . . . . . . . . . . . . . . . 19
  B. Discretion and the *Chevron* Analysis . . . . . . . . . . . 20
  C. *Chevron* Step One: Eligibility and Discretion . . . . . 22
  D. *Chevron* Step Two: Congressional Meaning Versus
    Regulatory Restrictions . . . . . . . . . . . . . . . . . . . 26
    1. Parole and Removal Proceedings . . . . . . . . 26
    2. Arriving Aliens and Adjustment of Status . . . 28
    3. Is the Regulation a Permissible Interpretation of
      the Statute? . . . . . . . . . . . . . . . . . . . . . . . . 30

VI. Application to Zheng . . . . . . . . . . . . . . . . . . . . . . . . . 32
  A. Zheng's Parole Status and the Effect of the Notice to
    Appear . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32
  B. Zheng's Adjustment Applications . . . . . . . . . . . . . . 34
  C. Who Has Jurisdiction Over Zheng's Application? . 35

VII. Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

## I. Introduction

  Zheng Zheng petitions this Court to review a decision by the Board of Immigration Appeals (BIA) denying his motion to reopen removal proceedings. Zheng raises two claims. First, he argues that the BIA should have granted his motion to reopen because of ineffective assistance of counsel. Zheng argues that his previous attorney was ineffective because he failed to file an appellate brief with the BIA after an Immigration Judge (IJ) denied his application for asylum. Because we find that the prejudice requirement of the ineffective assistance claim has not been met, we reject Zheng's argument on this point.

  Second, Zheng argues that the BIA should have granted his

request to remand his case so that an IJ might consider his petitions for adjustment of status. Zheng presses two applications to adjust status. First, he has an employment-based application. Second, he alleges that he is covered by the Chinese Student Protection Act of 1992, Pub. L. No. 102-404, 106 Stat. 1969 (CSPA), which allows certain Chinese nationals to adjust their status to that of lawful permanent residents. The government responds that Zheng is an "arriving alien" and, as such, forbidden by regulation from adjusting his status under 8 C.F.R. § 1245.1(c)(8). Zheng and the *amicus curiae* argue that this regulation is inconsistent with the governing statute, and therefore invalid, relying on the First Circuit's recent decision in *Succar v. Ashcroft*, 394 F.3d 8 (1st Cir. 2005).

While our reasoning differs somewhat from that of the First Circuit, we agree with that court's conclusion that 8 C.F.R. § 1245.1(c)(8) is not a valid exercise of the Attorney General's authority under the Immigration and Nationality Act (INA). We concur with the government that the statute grants the Attorney General broad discretion to issue regulations, and that this discretion may include some power to regulate eligibility to adjust status. But the Attorney General's power is not unlimited, and must be exercised consistently with the intent of the statute. Because the statute allows paroled aliens to apply for adjustment of status, whereas the regulation forecloses this statutory eligibility, the regulation is not based on a permissible statutory reading. We will therefore grant the petition for review and remand to allow the immigration authorities to consider Zheng's applications for adjustment of status.

## II. Facts and Procedural History

### A. Background Facts

Zheng Zheng was born on May 25, 1960, in Fuzhou, People's Republic of China. He claims that in 1989, when he was a middle school teacher in Fuzhou, he was involved in student uprisings. He apparently disseminated information from the BBC and Voice of America to the teachers and students of his school, passed out pamphlets, and organized rallies. The Chinese government cracked down on the student demonstrators in June

1989. As part of this crackdown, government authorities came looking for Zheng. He hid from security officers for a time, staying with friends and relatives, and eventually left China through Hong Kong and came to the United States. Zheng apparently arrived in California at some point in or after 1990, and entered the country without inspection by immigration officials.

Zheng eventually moved to Woodlyn, Pennsylvania, where he lived until 1993, when he returned to China briefly to visit his sick father. Before leaving for China, Zheng obtained a permission to re-enter (or "advance parole"), dated July 28, 1993, which allowed him to return to the United States under the status that he had when he left. Although Zheng was an uninspected illegal alien, he was not deportable at that time because then-President Bush had instituted a Deferred Enforced Departure (DED) program for certain Chinese nationals in the wake of the Tiananmen Square massacre. *See* Exec. Order No. 12,711, 55 Fed. Reg. 13897 (Apr. 11, 1990). Zheng was eligible for DED, so his permission to re-enter was issued. This allowed him to travel to China and return to the United States without being detained at the border as an illegal alien. He did in fact re-enter the United States on September 27, 1993, using his advance parole authorization.[1]

### B. Zheng's Adjustment Application

On October 20, 1993, Zheng filed an application to adjust status with the Immigration and Naturalization Service (INS).[2] In this application, he claimed that he was entitled to lawful permanent residence status under the Chinese Student Protection Act, because he had arrived in the United States before April 11, 1990, and met

---

[1]The DED program expired by its terms on January 1, 1994. Exec. Order No. 12,711, § 1, 55 Fed. Reg. 13897 (Apr. 11, 1990).

[2]On March 1, 2003, the INS's functions were transferred to the Bureau of Immigration and Customs Enforcement (ICE) and the U.S. Customs and Immigration Service (USCIS) of the United States Department of Homeland Security (DHS). *See Knapik v. Ashcroft*, 384 F.3d 84, 86 n.2 (3d Cir. 2004) (citing Homeland Security Act of 2002, Pub. L. No. 107-296, §§ 441, 451 & 471, 116 Stat. 2135, *codified at* 6 U.S.C. §§ 251, 271 & 291).

the other requirements of the CSPA. He submitted a sworn statement saying that he entered California on February 1, 1990, as well as various materials that tended to show that he was in New York prior to that date. The INS ultimately ruled on the application on May 5, 1999—almost six years after it was filed—finding that Zheng had failed to "present authentic and convincing evidence" to show that he had entered the United States prior to April 1990. It noted that many of the materials Zheng had submitted were proven to be fraudulent, and Zheng admitted as much, saying that he bought one of the documents on the street in Chinatown. The INS therefore denied Zheng's application to adjust his status.

## C. Removal Proceedings

That decision left Zheng as an unadmitted illegal alien. On October 29, 1999, the INS began removal proceedings by serving on Zheng a Notice to Appear alleging that he was an "alien present in the United States without being admitted or paroled" under 8 U.S.C. § 1182(a)(6)(A)(i). On January 7, 2000, the INS amended the Notice to Appear, withdrawing the § 1182(a)(6)(A)(i) charge and adding a charge under § 1182(a)(7)(A)(i)(I), which allows deportation of an alien who "is not in possession of a valid unexpired immigrant visa, reentry permit, border crossing identification card, or other valid entry document required by [the INA]." The new Notice to Appear also revised the factual allegations against Zheng, alleging that he was, "on September 27, 1993, paroled into the United States pursuant to Executive Order 12711," and that he was removable under the § 1182(a)(7)(A)(i)(I) standard.

Zheng retained an attorney, Sigang Li, who filed an asylum application on his behalf on August 7, 2000. A merits hearing was conducted before an Immigration Judge in Philadelphia on September 17, 2001. Zheng testified during a brief direct examination in which he contradicted his asylum application in several important respects. Most notably, he stated that he was depressed because he had just learned that his father had died on August 27, 2001—but his August 2000 asylum application listed his father as deceased. He also told a story about his interactions with the Chinese security agencies that differed in several particulars from the account in his application. In a lengthy cross-examination,

6

counsel for the INS pointed out these inconsistencies.

At the end of the September 17, 2001, hearing, the IJ issued an oral decision. Before reaching Zheng's asylum claims, he considered his CSPA application to adjust status, which had been submitted as an exhibit. He noted that Zheng "initially had indicated an intent to renew that application before this Court," but determined that Zheng, as a parolee, was an "arriving alien" under 8 C.F.R. § 1245.1(c)(8). The IJ thus decided that Zheng was ineligible for adjustment of status.

The IJ then turned to Zheng's claims for asylum, withholding of removal, and protection under the Convention Against Torture (CAT). Based on inconsistencies between Zheng's testimony and his application, the IJ made an adverse credibility finding. He thus denied asylum, withholding, and CAT relief. As for the asylum claim, he also found that Zheng should be barred from asylum because he filed his claim too late, *see generally* 8 C.F.R. § 208.4(a), although he noted that he would not have exercised his discretion adversely if Zheng had been credible and eligible for asylum.

### D. Appellate Proceedings

Zheng then engaged attorney Sigang Li to file an appeal before the BIA. Li filed a Notice of Appeal with the BIA, and checked the box indicating that he would file a brief. He never filed a brief, and now claims that this was because he did not receive a briefing schedule from the BIA. Without a brief from the petitioner, the INS also did not file a brief, and the BIA dismissed the appeal in a short per curiam order dated August 20, 2002. The dismissal was predicated mainly on Zheng's counsel's failure to file a brief, which can support a summary dismissal under 8 C.F.R. § 1003.1(d)(2)(i)(E) (formerly § 3.1(d)(2)(i)(D)). The BIA also considered the merits, however, noting that "upon review of the record, we are not persuaded that the Immigration Judge's ultimate resolution of this case was in error." Zheng never petitioned this Court to review the BIA's August 2002 decision.

Zheng retained new counsel, who filed a timely motion to reopen with the BIA on November 18, 2002, alleging ineffective assistance of counsel. The motion argued that Li's failure to file a brief constituted ineffective assistance and thus warranted

reopening. It further argued that Zheng was entitled to review of his application for adjustment of status. The motion to reopen also pressed Zheng's application to adjust status pursuant to the CSPA, and included a further application for adjustment of status based on an approved Petition for Alien Worker.[3]

In a March 5, 2003, decision, the BIA denied the motion to reopen, finding that Zheng had not complied with the procedural requirements of an ineffective assistance claim, and that even if he had, he did not demonstrate that any prejudice resulted from Li's failure to file a brief. The BIA also rejected Zheng's applications for CSPA and work-related adjustment of status, agreeing with the IJ that Zheng was an arriving alien in removal proceedings and therefore ineligible to apply for adjustment of status. Zheng retained a third attorney, who timely filed the present petition for review with this Court.[4] We have jurisdiction to review the final order of the BIA under 8 U.S.C. § 1252.

### III. The Motion To Reopen Asylum Proceedings

We deal first with Zheng's argument that the BIA should have granted his motion to reopen proceedings because of ineffective assistance of counsel. Zheng initially applied for asylum, withholding of removal, and CAT protection. Those applications were denied by the IJ, and Zheng's first attorney failed to file an

---

[3]Zheng's Immigrant Petition for Alien Worker was approved by the INS with a priority date of February 14, 2001. The petition was granted under INA section 203(b)(3)(A)(i), 8 U.S.C. § 1153(b)(3)(A)(i), which allows skilled workers (Zheng is a Chinese chef) to receive immigrant visas. An alien with such an approved petition may, in the discretion of the Attorney General, have his status adjusted to that of a lawful permanent resident. *See* 8 U.S.C. §§ 1153(b)(3) & 1229(a); *see generally* U.S. Citizenship and Immigration Services, How Do I Become a Lawful Permanent Resident While in the United States?, http://uscis.gov/graphics/howdoi/legpermres.htm (last visited August 8, 2005).

[4]Due to a mailing mishap, the March 2003 decision was reissued on August 4, 2003. The petition for review, dated September 2, 2003, was therefore timely filed within 30 days of the final order of removal. *See* 8 U.S.C. § 1252(b)(1).

appellate brief with the BIA, which affirmed the IJ's order. Zheng submits that this failure constituted ineffective assistance and required the BIA to reopen proceedings.

Motions to reopen immigration proceedings are viewed with strong disfavor, and "we review the BIA's decision to deny reopening for abuse of discretion, mindful of the 'broad' deference that the Supreme Court would have us afford." *Xu Yong Lu v. Ashcroft*, 259 F.3d 127, 131 (3d Cir. 2001).

## A. The Lozada Requirements

Aliens in removal proceedings have a Fifth Amendment right to due process, which entails a right to be represented by counsel. *Lu*, 259 F.3d at 131. Ineffective assistance of counsel may "constitute a denial of due process if 'the alien was prevented from reasonably presenting his case.'" *Id*. (quoting *Lozada v. INS*, 857 F.2d 10, 13-14 (1st Cir. 1988)).

The BIA has set forth three requirements for motions to reopen based on claims of ineffective assistance: (1) the alien's motion must be supported by an "affidavit of the allegedly aggrieved [alien] attesting to the relevant facts"; (2) "former counsel must be informed of the allegations and allowed the opportunity to respond," and this response should be submitted with the motion; and (3) "if it is asserted that prior counsel's handling of the case involved a violation of ethical or legal responsibilities, the motion should reflect whether a complaint has been filed with appropriate disciplinary authorities regarding such representation, and if not, why not." *Matter of Lozada*, 19 I. & N. Dec. 637, 639 (BIA 1988).

We have "generally agree[d] that the BIA's three-prong test is not an abuse of the Board's wide-ranging discretion." *Lu*, 259 F.3d at 133. The *Lu* panel, however, was not willing to "apply[] a strict, formulaic interpretation of *Lozada*," and noted that "only in rare circumstances have courts refused to reopen immigration proceedings *solely* because a petitioner failed to file a bar complaint." *Id*. at 133, 134 (emphasis in original). In *Lu* we denied a petition for review where the alien had neither set forth the relevant facts in sufficient detail, as required by the first prong of *Lozada*, nor filed a disciplinary complaint.

Zheng, however, seems to have satisfied the *Lozada*

9

requirements as we interpreted them in *Lu*. Unlike Lu, Zheng submitted a reasonably detailed affidavit explaining that his former attorney, Sigang Li, had agreed to file an appellate brief but never did. Second, Li was afforded an opportunity to respond, and did so in a statement in which he admitted that he had agreed to file a brief, but claimed that he did not do so because he never received a briefing schedule. Finally, although Zheng's later attorneys have not filed a disciplinary complaint against Li, *Lozada* does not mandate that they do so, so long as they explain why they did not. Zheng's attorneys have explained, in accordance with the third prong of *Lozada*, that they did not file a complaint because of their uncertainty as to whether or not Li ever received a briefing schedule. Zheng's present attorneys have been diligent in investigating this issue and have submitted a request under the Freedom of Information Act (FOIA) to determine whether such a briefing schedule was issued.[5] Zheng thus appears to have met the procedural requirements of *Matter of Lozada*.

### B. Prejudice

Nonetheless, Zheng's ineffective assistance claim fails because he has not demonstrated that prejudice resulted from the ineffective assistance of his BIA appellate counsel. Under *Lozada*, to prevail on an ineffective assistance claim, an alien must demonstrate not only that counsel's assistance was ineffective, but also that he was prejudiced by counsel's poor performance. 19 I. & N. Dec. at 638.

When the BIA dismissed Zheng's appeal for failure to submit a brief, it also stated that it was satisfied that the IJ's

---

[5]The FOIA documents revealed that the INS also did not submit a brief to the BIA, although the administrative record indicates that there was a briefing notice issued to Zheng's lawyer and to the INS. Zheng interprets the lack of an INS brief to mean that neither party actually *received* the briefing notice or schedule. The government, however, points out that the lack of an INS brief proves nothing, as the INS is not required to submit an appellate brief before the BIA. Without a brief from the alien, the INS would have no reason to file a brief: the alien's failure to file a brief is in itself sufficient cause for the BIA to dismiss the appeal. *See* 8 C.F.R. § 1003.1(d)(2)(i)(E).

decision was not erroneous. Similarly, in denying the motion to reopen, the BIA noted that the motion did not allege that any prejudice resulted from the ineffective assistance. A review of Zheng's motion to reopen confirms the BIA's conclusion: the motion states that Li's failure to file a brief "has irreparably prejudiced [Zheng's] eligibility for relief from removal," but it does not explain why Zheng would have been eligible for relief from removal in the first place. Indeed, in this petition for review, Zheng does not even argue that he could have prevailed on the asylum appeal if Li had filed a brief, beyond a general statement that he would have had the opportunity to "make his claim for asylum again to the BIA." Our limited review of the merits of Zheng's asylum claim satisfies us that no prejudice resulted from Li's failure to file an appellate brief, as explained in the margin.[6]

Instead, Zheng alleges two other kinds of prejudice. First, he argues that an effective appellate counsel would have been able to present his adjustment of status claims. Because the substance of those claims is currently before us, *see infra* Parts IV-V, no prejudice seems to have resulted from Li's failure to argue those issues before the BIA, and we consider those claims in connection with the merits rather than as part of an ineffective assistance argument.

Second, Zheng contends that "counsel's review of the hearing transcripts before the IJ . . . identifies serious concerns about the quality of the representation at that hearing." He asserts that Li was unwilling to meet with him to prepare his testimony, had trouble finding Zheng's file, and conducted only a brief and

---

[6]The IJ denied asylum on the basis of an adverse credibility finding, listing numerous discrepancies between Zheng's testimony and his asylum application and finding that Zheng's explanation of these problems on cross-examination was unconvincing. Furthermore, even if Zheng were credible, he does not seem to have alleged any past persecution: he was questioned by security officers, and was demoted at work. He does not, however, allege that he was ever detained (beyond a brief house arrest), tortured, or even threatened. He returned to China in 1993, and does not appear to have encountered any trouble during that visit. Zheng has given us no reason to believe that, if Li had filed an appellate brief with the BIA, the Board might have reversed the IJ's reasonable asylum decision.

unprepared direct examination. Li's incompetence before the IJ, Zheng argues, prejudiced his ability to present his asylum claims.

This argument was not presented to the BIA in the motion to reopen, which focused solely on ineffective assistance at the appellate level. The failure to exhaust this claim before the BIA "bars consideration of particular questions not raised in an appeal to the Board." *Alleyne v. INS*, 879 F.2d 1177, 1182 (3d Cir. 1989); *see also Awad v. Ashcroft*, 328 F.3d 336, 340 (7th Cir. 2003); *Prado v. Reno*, 198 F.3d 286, 292 (1st Cir. 1999). Furthermore, Zheng has not satisfied the *Lozada* requirements as to this claim: Li, his attorney, has had no opportunity to dispute Zheng's characterization of his performance before the IJ, and Zheng has not explained why no disciplinary complaint was filed regarding these allegations.

We reiterate that our review of the Board's decision turns on abuse of discretion. Based on the arguments presented to it, the BIA seems to have been well within its discretion to find that no prejudice resulted from Li's ineffective appellate assistance.

## IV. Adjustment of Status

A far more difficult question is presented by Zheng's attempts to renew his application to adjust status under the CSPA, and to adjust his status based on his employment-based immigrant visa petition. The BIA held that Zheng is ineligible for this relief because its regulations prohibit "arriving aliens" from adjusting status. This claim was raised as part of Zheng's motion to reopen, and the BIA's ultimate decision on the motion is subject to review for abuse of discretion. *Lu*, 259 F.3d at 131. The Board's legal conclusions, however, are subject to de novo review, "with appropriate deference to the agency's interpretation of the underlying statute." *Barrios v. Attorney General*, 399 F.3d 272, 274 (3d Cir. 2005) (citing *Abdulai v. Ashcroft*, 239 F.3d 542, 551-52 (3d Cir. 2001)).

### A. The Statutory and Regulatory Framework

While Zheng appears to be eligible to apply for adjustment of status under the plain terms of the Immigration and Nationality Act, a regulation promulgated pursuant to the Act renders him ineligible to do so. Zheng argues that the regulation is therefore

12

invalid, a claim we take up in Part V, *infra*. In this Part, we explain why Zheng is ineligible for adjustment under the terms of the relevant regulation.

### 1. Statutory Authority To Adjust Status

Zheng claims that he may adjust his status under INA section 245(a), 8 U.S.C. § 1255(a), which provides:

> The status of an alien who was inspected and admitted or paroled into the United States or the status of any other alien having an approved petition for classification under subparagraph (A)(iii), (A)(iv), (B)(ii), or (B)(iii) of section 204(a)(1) [8 U.S.C. § 1154(a)(1)] [or][7] may be adjusted by the Attorney General, in his discretion and under such regulations as he may prescribe, to that of an alien lawfully admitted for permanent residence if (1) the alien makes an application for such adjustment, (2) the alien is eligible to receive an immigrant visa and is admissible to the United States for permanent residence, and (3) an immigrant visa is immediately available to him at the time his application is filed.

Zheng argues that he was "admitted or paroled into the United States" by virtue of (1) his prior Deferred Enforced Departure status (which Zheng contends was an "admission") and (2) his re-entry to the United States pursuant to a grant of advance parole on September 27, 1993. If this contention is correct, then the statutory text would appear to render Zheng eligible for adjustment of status, although the final decision to adjust status is left to the discretion of the Attorney General.

Zheng applied to adjust status pursuant to the Chinese Student Protection Act of 1992, § 2, Pub. L. No. 102-404, 106 Stat.

---

[7]Subparagraphs (A)(iii), (A)(iv), (B)(ii), and (B)(iii) of 8 U.S.C. § 1154(a)(1) all refer to aliens who are the spouses or children of citizens or lawful permanent residents, and are not applicable here. The "or" in the statutory text of § 1255 appears to be a mistake, and is noted as such in the United States Code Annotated.

1969 (CSPA). In relevant part, the CSPA provides that an alien who (1) is a national of the People's Republic of China, (2) has resided continuously in the United States since April 11, 1990 (other than "brief, casual, and innocent absences"), and (3) was not in China for more than 90 days between April 11, 1990, and October 9, 1992, may adjust status to that of a lawful permanent resident without regard to availability of immigrant visas. *Id*. § 2(a) & (b). In addition, Zheng asks to adjust status pursuant to an employment-based application.

### 2. The Eligibility Regulation

The government responds that Zheng is ineligible to adjust status because he is an "arriving alien who is in removal proceedings." The government's theory is based on a regulation promulgated pursuant to the INA, which provides that "[a]ny arriving alien who is in removal proceedings pursuant to section 235(b)(1) or section 240 of the Act [8 U.S.C. § 1225(b)(1) or § 1229a]" is categorically "ineligible to apply for adjustment of status to that of a lawful permanent resident alien under section 245 of the Act [8 U.S.C. § 1255]." 8 C.F.R. § 1245.1(c)(8). We deal with the question whether Zheng is an "arriving alien" later. *See infra* Part IV.B. For now, we note that it is clear that Zheng is currently in removal proceedings under section 240 of the INA, 8 U.S.C. § 1229a, and therefore falls under the regulation if he is in fact an "arriving alien."

It is less clear that Zheng's application to adjust his status falls under section 245 of the INA, 8 U.S.C. § 1255. Zheng argues instead that it falls under the CSPA, which is a separate statute.[8] This argument is based on the BIA's decision in *Matter of Artigas*, 23 I. & N. Dec. 99 (BIA 2001), in which the Board allowed an arriving alien to adjust status pursuant to the Cuban Refugee Adjustment Act, Pub. L. No. 89-732, 80 Stat. 1161 (1966). The INS had argued that Artigas's application was barred by 8 C.F.R. § 1245.1(c)(8), but the BIA disagreed, finding that the regulation only covers section 245 applications, and "does not state that arriving aliens in removal proceedings are ineligible to apply for

---

[8]Zheng's application to adjust status based on his employment visa application falls squarely under section 245.

14

adjustment of status under the Cuban Adjustment Act." *Artigas*, 23 I. & N. Dec. at 104. Zheng argues that the CSPA, like the Cuban Refugee Adjustment Act, is an independent means of adjusting status, and that it is therefore not covered by § 1245.1(c)(8). The BIA disagreed, noting cursorily that it "[saw] no reason to extend [its] holding in *Matter of Artigas* . . . to the instant case."

Zheng's analogy has intuitive appeal, in that the CSPA and the Cuban Refugee Adjustment Act serve similar purposes, and there is therefore some logic to treating them similarly. Nonetheless, the two statutes work via different mechanisms, and this difference dooms Zheng's argument. The Cuban Refugee Adjustment Act specifically created a new mechanism for adjustment of status, in language that to some extent parallels section 245 but does not rely on it. (Indeed, that Act operates "[n]otwithstanding the provisions of section 245(c) of the Immigration and Nationality Act." Cuban Refugee Adjustment Act § 1, Pub. L. No. 89-732, 80 Stat. 1161.)

The CSPA, on the other hand, applies specifically "whenever [a covered] alien . . . applies for adjustment of status *under section 245* of the Immigration and Nationality Act." CSPA § 2(a)(1), Pub. L. No. 102-404, 106 Stat. 1969 (emphasis added). Thus the CSPA modifies some of the rules for Chinese aliens' applications for adjustment of status under section 245, but those applications are still made under that section. By its terms, then, the eligibility regulation applies to Zheng's case, even though it did not apply in *Artigas*.

We therefore find that Zheng's applications to adjust status were made pursuant to INA section 245, 8 U.S.C. § 1255. Thus, if Zheng is an "arriving alien," and if 8 C.F.R. § 1245.1(c)(8) is valid, then the regulation renders him ineligible for such relief.

*B. The "Arriving Alien" Category*

The next question facing us is whether Zheng is an "arriving alien" within the meaning of § 1245.1(c)(8). This phrase is defined by regulation:

> The term arriving alien means an applicant for admission coming or attempting to come into the United States at a port-of-entry, or an alien seeking

15

transit through the United States at a port-of-entry, or an alien interdicted in international or United States waters and brought into the United States by any means, whether or not to a designated port-of-entry, and regardless of the means of transport. An arriving alien remains such even if paroled pursuant to section 212(d)(5) of the Act, except that an alien who was paroled before April 1, 1997, or an alien who was granted advance parole which the alien applied for and obtained in the United States prior to the alien's departure from and return to the United States, shall not be considered an arriving alien for purposes of section 235(b)(1)(A)(i) of the Act.

8 C.F.R. § 1.1(q).[9]

While the first portion of this definition at first seems to support an intuitive reading of the term "arriving alien"—viz., that it means "an alien who is physically arriving at the border of the United States"—in fact the term has a much broader meaning. It encompasses not only aliens who are actually at the border, but also aliens who were paroled after their arrival.[10] It is therefore clear that

---

[9]Section 212(d)(5) of the INA, 8 U.S.C. § 1182(d)(5), authorizes the Attorney General to parole into the United States "temporarily under such conditions as he may prescribe only on a case-by-case basis for urgent humanitarian reasons or significant public benefit any alien applying for admission to the United States, but such parole of such alien shall not be regarded as an admission of the alien" and the parole must be terminated when its purposes have been served. Section 235(b)(1)(A)(i) of the INA, 8 U.S.C. § 1225(b)(1)(A)(i), governs screening of arriving aliens by immigration officers. As Zheng received advance parole in 1993, he is not an arriving alien for section 235(b)(1)(A)(i) purposes, and so cannot be summarily removed by an immigration officer.

[10]More broadly, courts and commentators seem to take "arriving alien" as a catch-all category containing all aliens who have not been "inspected and admitted" to the United States. *See, e.g.*, *Succar v. Ashcroft*, 394 F.3d 8, 16 (1st Cir. 2005) ("Parolees, although they are physically present in the United States, are treated as if they were at the border seeking admission."); Stanley Mailman & Stephen Yale-Loehr,

16

Zheng is an "arriving alien." He arrived in the United States without inspection, but then left pursuant to an advance parole. Because he re-entered with no legal status greater than that of a parolee, he is simply a paroled arriving alien.

Zheng objects to this characterization on two grounds, both of them erroneous. First, he maintains that, because he was subject to Deferred Enforced Departure after April 1990, he was admitted to the United States and so is not an arriving alien. There is no support for this contention. DED is not an admission status. Rather, the President simply ordered the Attorney General to defer deporting Chinese nationals between April 1990 and January 1994, because of worries about the effects of the Tiananmen Square crackdown. *See* Exec. Order No. 12,711, § 1, 55 Fed. Reg. 13897 (Apr. 11, 1990). This moratorium in enforcement of immigration laws against some aliens did not transform them into lawfully admitted immigrants.

Second, Zheng argues that application of the "arriving alien" classification to him is impermissibly retroactive, because the term entered the statute with the passage of the Illegal Immigration Reform and Immigrant Responsibility Act, Pub. L. No. 104-208, 110 Stat. 3009 (1996) (IIRIRA), whereas he has been in the United States since 1990. Zheng has cited no support for the proposition that this change in immigration terminology and procedure is impermissibly retroactive, and we reject it.[11]

We therefore conclude that Zheng is an "arriving alien" within the meaning of the regulations. Because he is an arriving alien in removal proceedings, and because he is attempting to apply for adjustment of status, he meets all of the criteria of 8 C.F.R.

---

*Adjustment of Status for Paroled Persons: An Endangered Species?*, N.Y. L.J., Feb. 28, 2005, at 3 (equating the term "arriving alien" with "unadmitted alien").

[11]Zheng cites *INS v. St. Cyr*, 533 U.S. 289 (2001), for the proposition that some of IIRIRA's changes are impermissibly retroactive. But *St. Cyr* dealt with a section of IIRIRA that "attache[d] new legal consequences to events completed before its enactment." *Id.* at 321 (quoting *Martin v. Hadix*, 527 U.S. 343, 357-58 (1999)). The definition of "arriving alien" does no such thing, and, apart from the effects of § 1245.1(c)(8), Zheng has not identified any substantive consequence of application of the new term to him.

§ 1245.1(c)(8), and is therefore ineligible to adjust status under the plain terms of that regulation. It remains for us to decide whether the regulation is valid.

## V. The Validity of the Regulation

Zheng contends that 8 C.F.R. § 1245.1(c)(8), the regulation that renders him ineligible to adjust status, is invalid. He argues that the regulation is inconsistent with the text of INA section 245, 8 U.S.C. § 1255(a), and therefore exceeds the Attorney General's regulatory authority. We note that 8 U.S.C. § 1252(a)(2)(B)(i) strips courts of jurisdiction to review "any judgment regarding the granting of relief under" 8 U.S.C. § 1255. This provision plainly forecloses review of the Attorney General's exercise of discretion in granting adjustment of status in individual cases, but we are satisfied that it does not foreclose review of the BIA's interpretation of the legal standards for eligibility for such adjustment. *See Succar v. Ashcroft*, 394 F.3d 8, 19-20 (1st Cir. 2005). The government does not now dispute that we have jurisdiction to consider Zheng's challenge to its regulations.

It appears that *amicus curiae* American Immigration Law Foundation (AILF) has made a concerted effort to bring and argue this claim in many of the Courts of Appeals. The result of this effort, for our purposes, is that we have two recent well-reasoned opinions from other Courts of Appeals to consult in ruling on the validity of the regulation. The first is *Succar v. Ashcroft*, *supra* (Lynch, J.), in which a unanimous panel of the First Circuit struck down the regulation. A short companion opinion, *Rodriguez de Rivera v. Ashcroft*, 394 F.3d 37 (1st Cir. 2005), further explained *Succar*.

In contrast, in *Mouelle v. Gonzales*, Nos. 03-1760 & 03-3086, — F.3d —, 2005 WL 1790137 (8th Cir. July 29, 2005) (Beam, J.), the Eighth Circuit rejected *Succar*'s conclusion and found that the regulation was within the scope of the Attorney General's authority. Judge Bye dissented, stating that he would follow the reasoning of *Succar*.[12]

_____

[12]The Fifth Circuit, in an unpublished decision, has rejected an arriving alien's request to adjust status despite an *amicus* brief filed by the AILF. *See Diarra v. Gonzales*, No. 04-60097, 2005 WL 1317057

## A. The Chevron Analysis

A court's review of a regulation interpreting a statute is normally subject to *Chevron* deference. This standard of judicial review requires a two-step inquiry:

> When a court reviews an agency's construction of the statute which it administers, it is confronted with two questions. First, always, is the question whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress. If, however, the court determines Congress has not directly addressed the precise question at issue, the court does not simply impose its own construction on the statute, as would be necessary in the absence of an administrative interpretation. Rather, if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute.

*Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 842-43 (1984) (footnotes omitted). However, where Congress has not merely failed to address a precise question, but has given an "express delegation of authority to the agency to elucidate a specific

_____

(5th Cir. 2005) (unpublished per curiam opinion). The *Diarra* panel merely found that the petitioner was an arriving alien under § 1245.1(c)(8), without addressing the validity of that regulation. It is unclear whether the question of validity was briefed.

Other pending cases in which the AILF has requested or been granted *amicus curiae* status include *Ramos Bona v. Ashcroft*, Nos. 03-71596 & 03-72488 (9th Cir.); *Hong v. Gonzales*, No. 04-74034 (9th Cir.); *Roozeky v. Ashcroft*, No. 04-71540 (9th Cir.); and *Shah v. Gonzales*, No. 05-10587 (11th Cir.). *See* American Immigration Law Foundation, *Succar*-Related Cases, http://www.ailf.org/lac/lac_arrivingalien.htm (last visited August 19, 2005). None of these cases had been decided as of the date of this opinion.

provision of the statute by regulation," then the agency's "legislative regulations are given controlling weight unless they are arbitrary, capricious, or manifestly contrary to the statute." *Id*. at 843-44.

In the first step of the *Chevron* analysis, courts may "employ[] traditional tools of statutory construction [to] ascertain[] that Congress had an intention on the precise question at issue." *INS v. Cardoza-Fonseca*, 480 U.S. 421, 448 (1987) (quoting *Chevron*, 467 U.S. at 843 n.9). "Even for an agency able to claim all the authority possible under *Chevron*, deference to its statutory interpretation is called for only when the devices of judicial construction have been tried and found to yield no clear sense of congressional intent." *Gen. Dynamics Land Sys., Inc. v. Cline*, 540 U.S. 581, 600 (2004).

*B. Discretion and the* Chevron *Analysis*

The government first argues that we owe § 1245.1(c)(8) even greater deference than the two-step *Chevron* structure would provide. Specifically, the government contends that § 1245.1(c)(8) is a mere exercise of the discretion that the statute explicitly entrusts to the Attorney General, and therefore cannot be overruled by a court. We could not second-guess the Attorney General's decision to deny adjustment in a specific instance, *see* 8 U.S.C. § 1252(a)(2)(B)(i), and the government contends that we have no more authority to question the Attorney General's decision to exercise this discretion by across-the-board regulation rather than by case-by-case decisionmaking.

In support of this argument, the government points to Attorney General Janet Reno's explanation of § 1245.1(c)(8) at the time of its promulgation. Although the regulation governs eligibility, the explanation was specifically phrased in terms of the Attorney General's discretion:

> Consistent with Congress' intent that arriving aliens . . . be removed in an expedited manner through the procedures provided in section 235(b)(1) of the Act [8 U.S.C. § 1225(b)(1)], the Attorney General has determined that she will not favorably exercise her discretion to adjust the status of arriving aliens who

20

are ordered removed pursuant to section 235(b)(1) of the Act or who are placed in removal proceedings under section 240 of the Act [8 U.S.C. § 1229a]. . . . If the Service decides as a matter of prosecutorial discretion, not to initiate removal proceedings but to parole the arriving alien, the alien will be able to apply for adjustment of status before the district director.

62 Fed. Reg. 444, 452 (1997).

As further support for its position, the government cites *Lopez v. Davis*, 531 U.S. 230 (2001). In *Lopez*, the Court considered a Bureau of Prisons (BOP) regulation denying early release to prisoners whose offense involved a firearm. Lopez, a prisoner, argued that this regulation was inconsistent with the governing statute, which provides that the BOP "may" grant early release to any prisoner convicted of a "nonviolent offense" who successfully completed a substance abuse treatment program. *See* 18 U.S.C. § 3621(e)(2)(B). The Court determined that the BOP was entitled to exercise its discretionary authority by categorical regulation, and was not confined to case-by-case assessments. 531 U.S. at 244.

*Lopez* supports the government's argument that the Attorney General may use regulation to define the contours of his discretion. But *Lopez* is a double-edged sword, for it does *not* stand for the proposition that the statutory grant of discretion to the Attorney General renders his exercise of that discretion functionally unreviewable. Instead, *Lopez* puts this discretionary authority squarely within the second step of the *Chevron* framework:

Beyond instructing that the Bureau has discretion to reduce the period of imprisonment for a nonviolent offender who successfully completes drug treatment, Congress has not identified any further circumstance in which the Bureau either must grant the reduction, or is forbidden to do so. In this familiar situation, where Congress has enacted a law that does not answer "the precise question at issue," all we must decide is whether the Bureau, the agency empowered to administer the early release program, has filled the

statutory gap "in a way that is reasonable in light of the legislature's revealed design."

*Lopez*, 531 U.S. at 242 (quoting *NationsBank of N.C., N.A. v. Variable Annuity Life Ins. Co.*, 513 U.S. 251, 257 (1995) (citing *Chevron*, 467 U.S. at 842)); *see also Mouelle*, 2005 WL 1790137, at *6.

Thus, we find that, to the extent that the statute grants the Attorney General the discretion to create categorical eligibility rules for adjustment of status, those rules are nonetheless subject to review for reasonableness under the second prong of the *Chevron* test.

### C. Chevron *Step One: Eligibility and Discretion*

We turn to the first prong of the *Chevron* analysis. We do so because Zheng and *amicus* argue that the statute does *not* grant the Attorney General any discretion to determine eligibility for adjustment of status. They argue instead that, while the Attorney General may issue regulations regarding the adjustment process, and while he certainly has discretion over the final decision to grant adjustment, Congress has explicitly spoken on the issue of *eligibility* for adjustment, and the Attorney General thus has no power to modify the statutory eligibility requirements. This argument was endorsed by the First Circuit in *Succar*, which found the statute unambiguous and struck down the regulation under the first prong of the *Chevron* test. *See* 394 F.3d at 24, 30.

This argument begins from the text of INA section 245(a), which, to repeat, provides:

> The status of an alien who was inspected and admitted or paroled into the United States . . . may be adjusted by the Attorney General, in his discretion and under such regulations as he may prescribe, to that of an alien lawfully admitted for permanent residence if (1) the alien makes an application for such adjustment, (2) the alien is eligible to receive an immigrant visa and is admissible to the United States for permanent residence, and (3) an immigrant visa is immediately available to him at the time his

22

application is filed.

8 U.S.C. § 1255(a). Zheng and *amicus* argue that the plain text of this provision allows any alien "inspected and admitted or paroled into the United States" to make an *application* to adjust status, although it leaves the ultimate discretion to *grant* adjustment in the hands of the Attorney General.

Zheng's argument draws further support from the structure of the adjustment provisions in the INA. Section 245 does not stop with the general adjustment provision quoted above; rather, it goes on to exclude several categories of aliens from eligibility for adjustment. Section 245(c), 8 U.S.C. § 1255(c), provides that subsection (a) shall not apply to alien crewmen, aliens who accept unauthorized employment or are in unlawful immigration status, aliens deportable for engaging in terrorist activities, and certain aliens with visa defects or other problems with their immigration status.[13] And subsection (e) provides that the Attorney General may not adjust the status of an alien who marries during removal proceedings and who seeks adjustment based on that marriage.

The First Circuit found this long list of statutory exclusions to be compelling evidence that "Congress unambiguously reserved to itself the determination of who is eligible to apply for adjustment of status relief." *Succar*, 394 F.3d at 24. That court noted that "when Congress desired to limit the ability of a non-citizen who might otherwise have been eligible to apply for adjustment of status under 1255(a), it has done so explicitly by defining several categories of aliens as not eligible to apply." *Id*. at 25. From the statutory text and structure, the court discerned "two themes":

> First, Congress explicitly rendered ineligible a certain category of aliens to apply. Second, that category of excluded aliens included some in removal proceedings, but Congress chose not to disqualify from eligibility all of those aliens "inspected and admitted or paroled" in removal or other judicial proceedings. In those limited circumstances when the involvement in proceedings works to hamper an

___

[13]The government does not contend that any of the § 1255(c) exclusions bar Zheng's application.

individual's ability to adjust status, Congress has
explicitly said so.

*Id*. These themes gave the First Circuit a "clear sense of
congressional intent," *id.* at 22 (quoting *Gen. Dynamics Land Sys.*,
540 U.S. at 600), and led it to conclude that the statute
unambiguously precluded the Attorney General from imposing
further restrictions on eligibility to apply for adjustment of status.

The First Circuit conceded that the statute grants the
Attorney General broad discretion to grant or deny adjustment of
status. But it found an important distinction between eligibility to
apply for adjustment and the substantive relief of a grant of
adjustment. In drawing this distinction, the court relied on *INS v.
Cardoza-Fonseca*, 480 U.S. 421 (1987). In that case, the Supreme
Court considered the asylum standard of "well-founded fear of
persecution," which the Attorney General had interpreted as
incorporating the withholding of removal standard that the alien be
"more likely than not" to be persecuted. The Court noted that the
Attorney General has discretion to grant asylum to eligible refugees,
but nonetheless rejected his interpretation of the standards for
eligibility. *See id*. at 443-44, 449. The First Circuit took this to
mean that "[t]he Supreme Court . . . has ruled that the two
questions of discretion as to the ultimate relief and discretion as to
eligibility exclusions are distinct." *Succar*, 394 F.3d at 23; *see also
INS v. Yang*, 519 U.S. 26, 30 (1996) ("While [8 U.S.C.
§ 1251(a)(1)(H)] establishes certain prerequisites to eligibility for
a waiver of deportation, it imposes no limitations on the factors that
the Attorney General . . . may consider in determining who, among
the class of eligible aliens, should be granted relief.").

The Eighth Circuit, disagreeing with *Succar*, pointed out that
*Cardoza-Fonseca* need not be read for the proposition that
discretion to grant substantive relief and discretion to restrict
eligibility are unrelated. *Cardoza-Fonseca* concerned the Attorney
General's interpretation of a statutory standard, while the regulation
at issue here "does not purport to interpret statutory eligibility
standards, but rather rests on the discretionary authority that
Congress explicitly gave the Attorney General to grant adjustment-
of-status relief." *Mouelle*, 2005 WL 1790137, at \*6. The court
asked rhetorically, "[W]hy should the Attorney General be forced
to exercise his discretion through rules that speak only to the

24

ultimate relief rather than eligibility?" *Id*. at \*5. Relying on *Lopez*, which allowed an agency to exercise its discretion via general rulemaking rather than by individual determinations, the Eighth Circuit concluded that "it makes little sense to invalidate this regulation simply because it speaks in terms of eligibility." *Id*.

While the question is close, we cannot agree with the First Circuit that the statutory text and structure indicate a clear intent to preempt the field of eligibility. The fact that Congress declared some categories of aliens ineligible for adjustment by statute does not in itself conclusively prove that the Attorney General cannot declare other categories ineligible by regulation. Indeed, in *Lopez*, the prisoner argued "that, by identifying a class of inmates ineligible for sentence reductions under § 3621(e)(2)(B), *i.e.*, those convicted of a violent offense, Congress has barred the Bureau from identifying further categories of ineligible inmates." 531 U.S. at 239. This argument is essentially identical to that adopted by *Succar*: that statutory eligibility standards "cover the field" and prevent an agency from further regulating eligibility. But the Supreme Court rejected this argument in *Lopez*, and we are unwilling to follow it here.[14] *See also Mourning v. Family Publ'ns Serv., Inc.*, 411 U.S. 356, 372 (1973) ("Respondent argues that, in requiring disclosure as to some transactions, Congress intended to preclude the [agency] from imposing similar requirements as to any other transactions. To accept respondent's argument would undermine the flexibility sought in vesting broad rulemaking authority in an administrative agency.").

We therefore find that, under the first step of the *Chevron* analysis, INA section 245 is ambiguous as to whether the Attorney

---

[14]The First Circuit distinguished *Lopez* by noting that in section 245, 8 U.S.C. § 1255, "Congress made numerous and explicit policy choices about who is eligible for adjustment of status relief, who is ineligible, and of those ineligible, who is nonetheless eligible with certain application restrictions." *Succar*, 394 F.3d at 29. In the *Lopez* statute, on the other hand, Congress had identified only a single class of ineligible inmates: those who had committed violent felonies. While this distinction is plausible, and section 245 and § 3621(e)(2)(B) certainly differ in specificity, we respectfully conclude that *Succar*'s distinction comes perilously close to rejecting the Supreme Court's holding in *Lopez*.

General may regulate eligibility to apply for adjustment of status.

### D. Chevron *Step Two: Congressional Meaning Versus Regulatory Restrictions*

Even if the statute is ambiguous, and even if the Attorney General is empowered to issue regulations to fill in gaps in the statute, those regulations must be "reasonable in light of the legislature's revealed design." *NationsBank*, 513 U.S. at 257. The fact that the Attorney General may regulate eligibility does not give him free rein to issue any eligibility regulations that he chooses; under the second step of *Chevron*, those regulations must still be "based on a permissible construction of the statute." 467 U.S. at 843.

### 1. Parole and Removal Proceedings

To deal with the second *Chevron* prong, we must examine the statute in more depth. We begin with the fact that section 245(a) allows the Attorney General to grant adjustment to any alien "who was inspected and admitted or paroled into the United States." 8 U.S.C. § 1255(a). Importantly, the statute grants eligibility to adjust status not only to those aliens who have been lawfully admitted into the United States, but also to those who have merely been paroled.

> Parole is authorized by section 212 of the INA:
> The Attorney General may, except as provided in subparagraph (B) or in section 1184(f) of this title, in his discretion parole into the United States temporarily under such conditions as he may prescribe only on a case-by-case basis for urgent humanitarian reasons or significant public benefit any alien applying for admission to the United States, but such parole of such alien shall not be regarded as an admission of the alien and when the purposes of such parole shall, in the opinion of the Attorney General, have been served the alien shall forthwith return or be returned to the custody from which he was paroled and thereafter his case shall continue to be dealt with in the same manner as that of any other applicant for admission to the United States.

26

8 U.S.C. § 1182(d)(5)(A). Regulations prescribe in more detail who may be paroled; it appears that the broadest class of parolees comprises those "whose continued detention is not in the public interest." 8 C.F.R. § 212.5(b)(5).

Paroled aliens are not admitted to the United States. 8 U.S.C. § 1101(a)(13)(B). Instead, they are treated by the statute as "applicants for admission." *Id.* § 1225(a)(1) ("An alien present in the United States who has not been admitted . . . shall be deemed for the purposes of this chapter an applicant for admission."). The statute provides that an applicant for admission "shall be detained for a [removal] proceeding" if an immigration officer determines that he or she is "not clearly and beyond a doubt entitled to be admitted." *Id.* § 1225(b)(2)(A). Parole is a form of relief from immigration *detention*; it is not a form of relief from *removal proceedings*, and when the purposes of parole have been served the parolee must be returned to custody and removal proceedings must continue. *Id.* § 1182(d)(5)(A). Thus, the statutory structure seems to indicate that virtually all parolees will be in removal proceedings.

The parties to this case have not provided us with any statistics to test our supposition that most parolees are in removal proceedings. However, the First Circuit noted in *Succar* that "it was represented in the briefs before this court that the 'majority of the intended beneficiaries of parolee adjustment of status are in removal proceedings,'" and that the Attorney General did not dispute that statistic. 394 F.3d at 21.

More compelling than any statistic, however, is the statutory structure that indicates that parolees will, by default, be in removal proceedings: any alien "not clearly and beyond a doubt entitled to be admitted" will be placed in removal proceedings, 8 U.S.C. § 1225(b)(2)(A), so any parolee—that is, any alien who has been inspected but not admitted—will *necessarily* be in removal proceedings. We thus do not rely exclusively upon the statistics provided to the *Succar* court; our conclusion is informed by the plain indication of congressional intent. It is clear from the statutory text that Congress intended for virtually all parolees to be in removal proceedings.[15]

---

[15]The Attorney General, in promulgating § 1245.1(c)(8), suggested that the then-INS might "decide[] as a matter of prosecutorial discretion, not to initiate removal proceedings but to parole the arriving

It is equally clear, of course, that Congress intended that parolees, as a general class, be eligible for adjustment of status: the statute provides explicitly that the Attorney General may grant adjustment to "an alien who was inspected and admitted or paroled into the United States." 8 U.S.C. § 1255(a). The statute further provides that the Attorney General may grant the adjustment "if the alien makes an application for such adjustment," *id.* § 1255(a)(1), which plainly contemplates that paroled aliens may make such an application (though of course the Attorney General need not grant it). Because the large majority of aliens paroled into the United States will be in removal proceedings, it is difficult to avoid the conclusion that Congress intended that the mere fact of removal proceedings would not render an alien ineligible to apply for adjustment of status. *See also Succar*, 394 F.3d at 25 ("Congress chose not to disqualify from eligibility all of those aliens 'inspected and admitted or paroled' in removal or other judicial proceedings.").

### *2. Arriving Aliens and Adjustment of Status*

The regulation under which the government wants to exclude Zheng provides as follows:

---

alien," which would then render the alien eligible to adjust status before the district director. 62 Fed. Reg. 444, 452 (1997). But of course, as outlined above, the decision to parole an alien is not synonymous with the decision not to initiate removal proceedings. Instead, as we have explained, parolees will by default—and by clear congressional intent—be in removal proceedings. Thus, under the text of the regulation, DHS's discretionary decision to parole an alien would not render the alien eligible for adjustment of status, because the alien would still be an arriving alien in removal proceedings.

Even assuming, however, that DHS does have the prosecutorial discretion to dismiss removal proceedings—an assumption that is questionable given the statutory requirement that parolees "*shall* be detained for a [removal] proceeding," 8 U.S.C. § 1225(b)(2)(A) (emphasis added)—Congress clearly intended for most parolees to be in removal proceedings. We thus doubt that DHS's prosecutorial discretion will result in many paroled aliens being eligible for adjustment under the regulation.

(c) Ineligible aliens. The following categories of aliens are ineligible to apply for adjustment of status to that of a lawful permanent resident alien under section 245 of the Act:

. . .

(8) Any arriving alien who is in removal proceedings pursuant to section 235(b)(1) or section 240 of the Act [8 U.S.C. § 1225(b)(1) or § 1229a] . . . .

8 C.F.R. § 1245.1. While the statute renders parolees eligible, as a general rule, for adjustment of status, the regulation appears to have the opposite effect. The regulation is phrased in terms of "arriving aliens," as defined by 8 C.F.R. § 1.1(q), but this term seems to be essentially synonymous with "applicants for admission" as defined by 8 U.S.C. § 1225(a)(1). *See supra* Part V.D.1. In particular, although the term "arriving alien" might sound like it refers only to those aliens physically in the process of arriving in the United States, it also extends to those who arrive and are paroled into the United States. *See* 8 C.F.R. § 1.1(q); *Succar*, 394 F.3d at 17; Part IV.B, *supra*. Thus "arriving aliens" appears to encompass most or all of those aliens who are paroled into the United States, as well as many of those aliens who are detained by DHS. Indeed, in its supplemental briefing, the government states that "[a] parolee is an 'arriving alien' who has been permitted temporary entry into the United States, as opposed to a non-parolee 'arriving alien' who has been detained for removal proceedings."

Similarly, the regulation limits its scope to arriving aliens who are "in removal proceedings," but as we have seen this is no real limitation. At least the majority of aliens paroled into the United States are in removal proceedings, yet, as explained above, Congress's clear intent is that virtually all parolees should be in such proceedings. *See supra* Part V.D.1. We are thus faced with a regulation that renders most aliens paroled into the United States ineligible to apply for adjustment of status.

The government points out that, under its regulations, some parolees may be eligible for adjustment of status. Specifically, the government notes that an arriving alien may *renew* an adjustment application that was denied by a district director, if the alien had filed the denied application pursuant to an earlier admission into the United States and then renewed the application after returning to the

29

United States under the terms of an advance parole granted in order to pursue the adjustment application. *See* 8 C.F.R. § 1245.2(a)(1)(i) & (ii). This is, however, a very narrow exception.[16] Moreover, it does not comport with Congress's stated intent that parolees should be eligible to apply for adjustment of status. The parolees allowed to adjust status under § 1245.2(a)(1) are only those who are *renewing* applications that they made as "admitted" aliens; the regulation makes no provision for aliens making a first-time application while in removal proceedings. Thus, under the government's reading, paroled aliens may not really *apply* to adjust status; they may only *renew* applications that they made when they were not "paroled" but "admitted."

In short, while there may be paroled aliens who are eligible to apply for adjustment of status under the regulations promulgated by the Attorney General, the government has not pointed to any significant category of paroled aliens who would in fact be eligible to make such an application. For all practical purposes, then, it appears that § 1245.1(c)(8) renders paroled aliens ineligible to apply for adjustment of status.

*3. Is the Regulation a Permissible Interpretation of the Statute?*

We are thus faced with a statute providing that, in general, aliens paroled into the United States may apply to adjust their status, and a regulation providing that, in general, they may not. The

_____

[16]The government points out that this exception existed prior to the passage of IIRIRA and the 1997 adoption of § 1245.1(c)(8). In *Matter of Castro-Padron*, 21 I. & N. Dec. 379 (BIA 1996), the BIA held that an IJ had no jurisdiction to entertain an application for adjustment of status made by an alien in removal proceedings, except in the narrow circumstances described in the text. The government cites *Castro-Padron* for the theory that the § 1245.1(c)(8) exception "is not a new rule that the INS is imposing." But prior to 1997, while IJs lacked jurisdiction to consider applications like Zheng's, INS district directors had such jurisdiction. *See Castro-Padron*, 21 I. & N. Dec. at 380 ("The applicants can file their adjustment applications with the district director of the Immigration and Naturalization Service, who has sole jurisdiction over the application and can act on the application independently of [the removal] proceedings."). After 1997, the regulations prevent aliens in Zheng's position from applying for adjustment in *any* forum.

conflict between regulation and statute is clear and unmistakable. Under the second step of the *Chevron* test, "we must determine 'whether the regulation harmonizes with the plain language of the statute, its origin, and purpose. So long as the regulation bears a fair relationship to the language of the statute, reflects the views of those who sought its enactment, and matches the purpose they articulated, it will merit deference.'" *Appalachian States Low-Level Radioactive Waste Comm'n v. O'Leary*, 93 F.3d 103, 110 (3d Cir. 1996) (quoting *Sekula v. FDIC*, 39 F.3d 448, 452 (3d Cir.1994)).

While this is a deferential standard, we think it plain that § 1245.1(c)(8) fails to meet it. As we have explained above in some detail, Congress's clearly expressed intent was to allow most paroled aliens to apply for adjustment of status; the regulation's effect is to bar almost all such aliens from adjustment. Congress's intent is apparent both from the language of the statute, allowing aliens "paroled into the United States" to apply for adjustment, and from its structure, allowing such applications as a general matter and excluding only a few narrow classes from eligibility. This conclusion is supported by the legislative history. The First Circuit in *Succar* examined the history of INA section 245 in some detail, and came to the conclusion that Congress's intent in enacting that section was to spare admitted and paroled aliens the hardship and expense of having to leave the United States in order to apply for an adjustment of status to which they were entitled. *See Succar*, 394 F.3d at 32-34.

We have found that the text of INA section 245 leaves some ambiguity about whether the Attorney General may determine by regulation what classes of aliens are eligible to apply for adjustment of status, thus precluding reliance on the first prong of the *Chevron* test. *See supra* Part V.C. But, as we noted there, the decision is a close one: the statutory structure and language noted by the *Succar* court, while not unambiguous, certainly suggest that Congress intended to regulate eligibility by statute rather than to leave it in the Attorney General's hands. The closeness of the step one question has some bearing on our step two decision. While the statute may be ambiguous enough to allow for some regulatory eligibility standards, it does not so totally abdicate authority to the Attorney General as to allow a regulation, like § 1245.1(c)(8), that essentially reverses the eligibility structure set out by Congress.

*Chevron*, of course, stands for the proposition that

31

administrative agencies receive broad deference in interpreting the statutes which they are charged with enforcing. We are mindful of our obligation to respect the decisions of the immigration agencies, which are informed by long experience and deep specialization in matters of great national importance. But we have an even higher obligation to respect the clearly expressed will of Congress, which in promulgating and amending the INA made its own considered decisions, balancing the need to swiftly remove undeserving aliens against the desire to afford every applicant a fair chance to request any immigration benefits that he or she may deserve.

Given Congress's intent as expressed in the language, structure, and legislative history of INA section 245, the regulation's effect of precluding almost all paroled aliens from applying to adjust their status does not "harmonize[] with the plain language of the statute, its origin, and purpose." *Sekula*, 39 F.3d at 452. Because 8 C.F.R. § 1245.1(c)(8) is not based on a permissible reading of INA section 245(a), 8 U.S.C. § 1255(a), we hold that the regulation is invalid insofar as it renders parolees ineligible to apply for adjustment of status. As explained in the following Part, we will therefore remand Zheng's case to the immigration authorities for further consideration.

## VI. Application to Zheng

Having held that § 1245.1(c)(8) is invalid
, we now turn to several miscellaneous issues, specific to Zheng's case, that the government contends prevent him from applying for adjustment of status.

### A. Zheng's Parole Status and the Effect of the Notice to Appear

Zheng meets section 245's requirement that he be an alien "admitted or paroled into the United States," 8 U.S.C. § 1255(a), because he was granted advance parole to return to the country in 1993. *See supra* Part II.A. The government argues, however, that his parole was revoked when the INS served him with a Notice to Appear. The regulations provide that, "[w]hen a charging document is served on the alien, the charging document will constitute written notice of termination of parole, unless otherwise specified." 8 C.F.R. § 212.5(e)(2)(i). Thus, because Zheng's parole was revoked

when a Notice to Appear was served on him, he is said to no longer be "paroled into the United States" under the terms of section 245.

While this argument is facially plausible, it seems to conflict with the statutory and regulatory scheme. The Notice to Appear institutes removal proceedings, but it does not normally revoke parole in any literal, physical sense. Thus the Notice to Appear in our record ordered Zheng to appear before an Immigration Judge; it did not commit him to INS custody. The regulation quoted above also provides that "[i]f the exclusion, deportation, or removal order cannot be executed within a reasonable time, the alien shall again be released on parole unless in the opinion of [a DHS] official . . . the public interest requires that the alien be continued in custody." 8 C.F.R. § 212.5(e)(2)(i). Because Zheng does not seem to have been taken into custody, and because the Notice to Appear merely commenced removal proceedings rather than executing a removal order, we are forced to conclude that this exception applied to Zheng, and that he was free on parole during his removal proceedings.[17] Perhaps the Notice to Appear revoked his parole, but, if so, he was immediately reparoled.

Because Zheng appears to have remained free on parole throughout the pendency of removal proceedings, and is free on parole now, we hold that he qualifies as an "alien paroled into the United States" under the terms of section 245. We leave to another day a determination of whether DHS may prevent a paroled alien from applying for adjustment of status by serving a Notice to Appear and committing the alien to custody. Zheng argues, with some force, that the statute uses a past participle, speaking in terms of aliens "admitted or paroled into the United States," not merely aliens *currently* free on parole. While this word choice is not conclusive evidence, it does suggest that DHS might be unable to terminate adjustment eligibility simply by revoking parole.

We also note *amicus*'s argument that the revised Notice to Appear charged Zheng only with lack of possession of a valid unexpired immigrant visa under INA section 212(a)(7)(A)(i)(I), 8 U.S.C. § 1182(a)(7)(A)(i)(I), and that the CSPA specifically excludes this charge as a basis for denying adjustment of status,

---

[17]The government has never contended that the public interest requires that Zheng be held in custody, nor is there any evidence in the record to support such a contention.

CSPA § 2(a)(3)(A), 106 Stat. at 1969. We agree with *amicus* that it seems anomalous to allow DHS to revoke Zheng's eligibility to adjust status by charging him under a section of the INA that the CSPA renders inapplicable.

### *B. Zheng's Adjustment Applications*

Zheng presses two adjustment applications. One is based on his approved employment-based immigrant visa petition. Zheng's employment-based adjustment application was first raised in his motion to reopen before the BIA. As far as we can determine, neither the DHS, the IJ, nor the BIA has considered this application. Because we have found that Zheng is eligible to apply for adjustment, we will remand this application for further consideration by the proper authorities. *See infra* Part VI.C.

Zheng's second adjustment claim is a renewal of his application to adjust status pursuant to the CSPA, which was previously denied because Zheng had submitted fraudulent documents in support of his claim. Indeed, the 1999 denial of Zheng's adjustment petition is what precipitated these removal proceedings.

We are sympathetic to the government's position that "the statute does not mandate that Zheng, or any other alien, be given a second chance to apply for adjustment of status." But the BIA explicitly rejected Zheng's CSPA adjustment application, not because it was duplicative, but because the Board found that Zheng, as an arriving alien in removal proceedings, is ineligible for adjustment of status. We are bound to review the agency's decision based solely on the stated grounds for that decision. *See SEC v. Chenery Corp.*, 318 U.S. 80, 95 (1943); *Li v. Attorney General*, 400 F.3d 157, 163 (3d Cir. 2005). Here, the BIA's stated basis for denying relief was the § 1245.1(c)(8) eligibility regulation, which we have found invalid.

As the First Circuit put it in the companion case to *Succar*:

> Since the agency action . . . cannot be sustained on the stated grounds, the appropriate remedy is to remand to the BIA for further proceedings consistent with the holding [on the eligibility issue]. We do not address any other issues.

34

We do not, for example, address the issue of whether Rivera's application for adjustment of status is somehow number-barred because she already filed one earlier application, which was denied. None of the IJ, the BIA, or the government in its brief to this court have suggested that any such number bar exists.

*Rodriguez de Rivera*, 394 F.3d at 40. Similarly, here, although the government has in its brief argued the unfairness of giving Zheng multiple chances to submit credible evidence of his CSPA claim, it has not pointed to any provision of the statute or regulations that would bar Zheng from renewing his application for adjustment of status. We must therefore remand that application to the immigration authorities.

### *C. Who Has Jurisdiction Over Zheng's Application?*

In order to remand this case, we must determine who has jurisdiction to hear Zheng's applications for adjustment of status. Jurisdiction over applications to adjust status is allocated by regulation:

An alien who believes he or she meets the eligibility requirements of section 245 of the Act [8 U.S.C. § 1255] or section 1 of the Act of November 2, 1966 [viz., the Cuban Refugee Adjustment Act], and [8 C.F.R.] § 1245.1 shall apply to the director having jurisdiction over his or her place of residence unless otherwise instructed in 8 CFR part 1245, or by the instruction on the application form. After an alien, other than an arriving alien, is in deportation or removal proceedings, his or her application for adjustment of status under section 245 of the Act . . . shall be made and considered only in those proceedings. An arriving alien, other than an alien in removal proceedings, who believes he or she meets the eligibility requirements of section 245 of the Act . . . and § 1245.1 shall apply to the director having jurisdiction over his or her place of arrival.

8 C.F.R. § 1245.2(a)(1).

This regulation appears to create three categories of applicants. First, there is a broad catch-all category of aliens who believe they are eligible. These aliens may apply for adjustment to the district director[18] with jurisdiction over their residence. Second, aliens who are not arriving aliens, but who are in removal proceedings, may apply for adjustment in those proceedings—ordinarily, we expect, to the IJ with jurisdiction over the removal proceedings. Third, arriving aliens who are *not* in removal proceedings may apply for adjustment to the district director with jurisdiction over their place of arrival.

This list seems to omit a fourth category, arriving aliens who are in removal proceedings. Such an omission is, of course, perfectly consistent with § 1245.1(c)(8), which renders that class of aliens ineligible to apply for adjustment of status. Because we have found the eligibility regulation invalid, however, we must consider the impact of our decision on the jurisdictional regulation: if arriving aliens in removal proceedings are eligible to adjust status, then someone must have jurisdiction to consider their applications.

In a letter dated February 4, 2005, we asked counsel to address the question of who should have jurisdiction to hear adjustment petitions of arriving aliens in removal proceedings if we were to find that such aliens were eligible to adjust status. Following oral argument, the parties submitted supplemental

---

[18]At the time this regulation was enacted, the district director was a local official of the INS. With the enactment of the Homeland Security Act of 2002, the term's meaning has become inscrutable. *See* 8 C.F.R. § 1.1(o) ("On or after March 1, 2003, pursuant to delegation from the Secretary of Homeland Security or any successive re-delegation, the terms ['director' or 'district director'] mean, to the extent that authority has been delegated to such official: service center director; special agent in charge; field office director; district director for services; district director for interior enforcement; or director, field operations."). We use "district director" to designate whatever DHS official is now responsible for reviewing applications to adjust status, probably a USCIS District Director. It appears that adjustment of status applications are now made at district offices of the USCIS. *See, e.g.*, USCIS Philadelphia Field Office, About Us, http://uscis.gov/graphics/fieldoffices/ philadelphia/aboutus.htm (last visited August 6, 2005).

briefing on this and other questions. Zheng's position is that the Immigration Judge responsible for removal proceedings should have jurisdiction over his adjustment applications. The government's position is less clear, but it appears to ask us to "leave to the Attorney General the determination of who has jurisdiction over such applications."

The simplest reading of § 1245.2(a)(1) in light of our eligibility holding is that aliens in Zheng's position fall into the catch-all category of aliens who may apply to the USCIS district director responsible for their place of residence. This reading is bolstered by the fact that, prior to the enactment of the eligibility regulation that we have invalidated today, an arriving alien in removal proceedings was required to file his or her adjustment applications with the INS district director rather than the IJ hearing the removal proceedings. *See Matter of Castro-Padron*, 21 I. & N. Dec. 379, 380 (BIA 1996) ("The applicants can file their adjustment applications with the district director of the Immigration and Naturalization Service, who has sole jurisdiction over the application and can act on the application independently of [the removal] proceedings."); *see also supra* note 16.

In *Succar* and *Rodriguez de Rivera*, the First Circuit invalidated § 1245.1(c)(8) and remanded to the BIA without explaining who had jurisdiction to hear petitioners' adjustment applications. *See Succar*, 394 F.3d at 36; *Rodriguez de Rivera*, 394 F.3d at 40. Consistent with our reading above, commentators seem to have assumed that the district director will have exclusive jurisdiction to hear adjustment applications from arriving aliens in removal proceedings. But other conclusions are possible:

> As a consequence [of *Succar*], parolees in proceedings are currently eligible to adjust status before USCIS notwithstanding the fact that the individual is in proceedings. Moreover, it is reported that at least some of the immigration judges in the Boston immigration court are also accepting adjustment applications from "arriving alien" parolees and adjudicating them.

Sarah Ignatius & Elisabeth S. Stickney, *Immigration Law & the Family* § 8:35 (database updated 2005).

Because the plain text of § 1245.2(a)(1) appears to grant the district director the jurisdiction to hear adjustment of status applications from arriving aliens in removal proceedings, and because neither party has provided any convincing argument for granting jurisdiction to any other official, we tentatively conclude that the USCIS district director for Philadelphia should have jurisdiction over Zheng's adjustment application. Nonetheless, we will remand to the BIA for further consideration; if the parties agree, or the BIA is convinced, that the IJ has jurisdiction to hear Zheng's application, then the Board may remand it to the IJ rather than to the district director.

## VII. Conclusion

For the reasons set forth in Part II, we will deny Zheng's petition for review insofar as it relates to his motion to reopen asylum proceedings. But because 8 C.F.R. § 1245.1(c)(8) contradicts the clear language and expressed intent of INA section 245(a), 8 U.S.C. § 1255(a), we find that the regulation is not a permissible exercise of the Attorney General's discretion. Therefore, as an alien paroled into the United States, Zheng is eligible to apply for adjustment of status, which the Attorney General may grant or deny in his discretion, and we will grant the petition for review on that basis. We will remand this case to the BIA for further proceedings consistent with this opinion. On remand, the BIA must determine who has jurisdiction over Zheng's adjustment applications.