United States Court of Appeals
Fifth Circuit

**F I L E D**

May 23, 2006

Charles R. Fulbruge III
Clerk

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

———————————————

No. 04-60497
consolidated with
No. 04-60895

———————————————

RAJA AKHTAR; MOHAMMAD SALMAN,

                                        Petitioners,

versus

ALBERTO R. GONZALES, Attorney General of the United States,

                                        Respondent.

———————————————

Petition for Review of an Order of the
Board of Immigration Appeals

———————————————

Before HIGGINBOTHAM, DAVIS, and STEWART, Circuit Judges.

PATRICK E. HIGGINBOTHAM, Circuit Judge:

    Raja Akhtar and Mohammad Salman, citizens of Pakistan, are "paroled" "arriving aliens" in removal proceedings.  Under a regulation promulgated in 1997, such aliens cannot apply for adjustment of status to become immigrants.  Because they mount the same legal challenge to the regulation, a challenge upheld by four of our sister circuits and rejected by one, we consolidated their appeals.  We reject the challenge and affirm.


I. Factual Background

A. Raja Akhtar

Raja Akhtar, a native and citizen of Pakistan, entered the United States in 1990 through Texas using a fraudulent passport. He has been living in this country ever since, going abroad once, in 1997, pursuant to a fraudulently obtained advance parole. In 2000, Akhtar married his current wife, Aracely Cuellar Chapa, a United States citizen, with whom he has two citizen children.

The INS, now part of the Department of Homeland Security and the U.S. Customs and Immigration Service (USCIS), commenced removal proceedings against Akhtar on December 9, 2000. In response, Akhtar filed an application for cancellation of removal and an application for adjustment of status based on his marriage. He also sent a letter to the INS District Director, asking him to temporarily terminate the removal proceedings because the Immigration Judge lacked jurisdiction to hear the application for adjustment of status while the proceedings continued. The INS asked the IJ to confirm that she lacked such jurisdiction under a regulation forbidding applications from "arriving aliens" in removal proceedings, like Akhtar. The IJ did so. After the District Director refused to terminate removal proceedings, the IJ denied Akhtar's application for cancellation of removal, finding that he failed to establish that removal would cause "exceptional and extremely unusual hardship" to a qualifying family member, and issued a final order of removal. The Board of Immigration Appeals dismissed his appeal without

2

comment.[1]

On appeal to this court, Akhtar argues: 1) that the regulation precluding applications for adjustment of status from "arriving aliens" in removal proceedings is invalid;[2] 2) alternatively, since the USCIS District Director has jurisdiction to adjudicate such applications if removal proceedings are conditionally terminated, that we should "initiate" conditional termination; and 3) that the IJ erred in denying Akhtar's application for cancellation of removal.

### B. Mohammad Salman

Mohammed Salman, a native and citizen of Pakistan, entered the United States at San Francisco International Airport on April 25, 2001, using another person's passport and visa. He then attempted to assume that person's identity.

The INS detained Salman and commenced removal proceedings against him on May 9, 2001, releasing him from custody and paroling him into the United States on June 19 after he posted bond. The INS transferred his case to Houston after Salman moved to Texas. On August 20, Salman applied for asylum and admitted that he was removable as charged. On November 11, 2002, Salman

---

[1] Akhtar had also filed an earlier adjustment of status application based on a previous wife, a wrinkle discussed by the IJ but irrelevant to this appeal.

[2] Respondent argues that Akhtar waived this argument by conceding to the IJ and the District Director that the regulation precluded jurisdiction over his application, first arguing invalidity of the regulation to the BIA. We rejected this argument in our January 5, 2005 order denying Respondent's motion to dismiss, and we do not address it again.

married his current wife, Senovia Ramiers, a United States citizen, with whom he has one child, an American citizen by birth.

During removal proceedings, the IJ denied Salman's motion for continuance to allow adjudication of an immigrant visa petition based on his marriage. The BIA affirmed, concluding that the IJ did not abuse her discretion in refusing to continue the proceedings because Salman, as an arriving alien in removal proceedings, was ineligible to adjust status under current regulations,[3] rending a continuance pointless. Salman appeals, challenging the validity of that regulation and, hence, the IJ's denial of his motion for continuance.

## II. Statutory & Regulatory Background

Before 1960, aliens in the United States without a valid visa had to go abroad to apply for permanent resident (immigrant) status. In 1960, Congress eliminated that burden by expanding eligibility for "adjustment of status" under 18 U.S.C. § 1255(a)

---

[3] The BIA held that Salman, "an arriving alien, is not eligible to adjust his status in removal proceedings," leaving open the possibility that he is eligible to adjust status elsewhere — for instance, with the District Director — even though he is in removal proceedings. However, the regulation governing adjustment procedure, 8 C.F.R. § 245.2(a)(1), states that aliens in removal proceedings (albeit in conjunction with the challenged regulation, 8 C.F.R. § 245.1(c)(8), this means non-arriving aliens) must adjudicate their applications in the proceedings, not in front of the District Director. Salman interprets the BIA's ruling to be that arriving aliens in removal proceedings cannot apply anywhere, the position maintained by the Government in this appeal and other cases. We agree with that interpretation.

4

to all aliens "inspected and admitted or paroled,"[4] allowing people in the country to apply for immigrant status without leaving, even those in the country without a valid visa. "Paroled" aliens are those aliens allowed to enter the country temporarily, without a valid visa, while authorities investigate their eligibility for admission.  Under § 1255(a), Respondent may, "in his discretion and under such regulations as he may prescribe," grant such an application.  8 U.S.C. § 1252(a)(2)(B)(i) makes unreviewable his use of that discretion.

Before 1997, aliens were divided into two categories: "applicants for admission," also called "arriving aliens," those aliens who had not yet "entered"[5] the country, and aliens present in the U.S. who had already "entered," with or without inspection.  Paroled aliens were considered arriving aliens. After inspection, arriving aliens were either admitted or "excluded" during "exclusion proceedings;" aliens who had already entered were either admitted or "deported" during "deportation proceedings."

Pursuant to  § 1255(a), parolees could adjust status with the District Director — even if they were in exclusion

---

[4] The aliens must also be eligible for and have immediately available an immigrant visa, based on family, employment, or diversity.  *See Succar v. Ashcroft*, 394 F.3d 8, 12-19 (1st Cir. 2005) (thoroughly detailing the relevant history and statutory structure).

[5] An alien may have been physically present in the country but not yet have "entered" for immigration purposes.

proceedings.  The BIA held that in exclusion proceedings, the District Director, not the IJ, maintained jurisdiction over applications.[6]

The 1997 Illegal Immigration Reform and Immigration Responsibility Act (IIRIRA)[7] eliminated the concept of "entry" to differentiate aliens, replacing it with the concept of admitted versus non-admitted aliens.  The main effect is that aliens present in the U.S. who have not been not been inspected or admitted are added to those considered applicants for admission, or arriving aliens.  It also replaced exclusion and deportation with "removal," applicable to all aliens in the country without inspection, inspected but not admitted, or previously admitted but now subject to removal.[8]  The IIRIRA did not change § 1255(a) or otherwise change the adjustment of status process.

In 1997, Attorney General Janet Reno issued new regulations said to implement the IIRIRA.  The regulations created a new definition for "arriving alien," a term that had existed without definition in the old statute: "The term arriving alien means an

---

[6] Historically, the District Director also had jurisdiction over applications by admitted aliens in deportation proceedings.  However, in 1961 regulations gave the IJ in an deportation proceeding authority to renew an application denied by the District Director or adjudicate an initial application, divesting the District Director of jurisdiction once deportation proceedings began.  The BIA determined, however, that the District Director retained sole jurisdiction during exclusion proceedings.

[7] Pub. L. No. 104-208, 110 Stat. 3009-546; *see generally Reno v. American-Arab Anti-Discrimination Comm.*, 525 U.S. 471 (1999).

[8] There are special procedures for stowaways, dangerous people, and people entering who lie or lack proper documents.  *See Succar*, 394 F.3d at 13.

6

applicant for admission coming or attempting to come into the United States at a port of entry....An arriving aliens remains such even if paroled [except aliens paroled before April 1, 1997 or aliens receiving advance parole]....”[9]  This definition is not in controversy, merely codifying the previously understood definition, which under the IIRIRA now encompasses all non-admitted aliens.

The Attorney General made a more substantive change to the adjustment of status regulations, 8 C.F.R. § 245.1(c)(8), rendering seven categories of aliens “ineligible” to apply for adjustment of status under § 1255(a), including “[a]ny arriving alien who is in removal proceedings....”  This regulation dovetails with the new regulation governing adjustment procedure, promulgated at the same time:

> An alien [who believes he is eligible for adjustment of status] shall apply to the director having jurisdiction over his or her place of residence....After an alien, *other than an arriving alien*, is in deportation or removal proceedings, his or her application...shall be made and considered only in those proceedings...An arriving alien, *other than an alien in removal proceedings*, who believes he or she meets the eligibility requirements...shall apply to the director having jurisdiction over his or her place of arrival....[An alien on advance parole (hence not an arriving alien) whose application was denied by the District Director may renew that application in removal proceedings.][10]

Thus, § 245.1(c)(8) prevents arriving aliens, including parolees,

---

[9] 8 C.F.R. § 1.1(q).

[10] 8 C.F.R. § 245.2(a)(1) (emphasis added).

in removal proceedings from filing for adjustment of status, either with the District Director, as they had been able to do in exclusion proceedings before 1997, or the IJ.

The parties agree that Akhtar and Salman are parolees in removal proceedings.[11] Instead, Akhtar and Salman challenge the validity of § 245.1(c)(8), arguing that in rendering parolees in removal proceedings ineligible to apply, it conflicts with § 1255(a), which makes parolees eligible to apply without mention of removal proceedings.

In promulgating § 245.1(c)(8), the Attorney General explained that she was furthering Congress's intent to expedite removal of arriving aliens by "not favorably exercis[ing]" her unreviewable discretion to adjust status under §§ 1255(a) and 1252(a)(2)(B)(i).[12] She explained further that arriving aliens in removal proceedings eligible for immigrant visas would have to return to their home countries to apply, although she might exercise her "prosecutorial discretion" not to initiate removal proceedings or to terminate removal proceedings to allow applicants to apply to the District Director. Respondent Alberto Gonzalez, Reno's successor, maintains this position.

---

[11] Akhtar claimed below that he had gone abroad in 1997, returning on advance parole, exempting him the definition of "arriving alien" and allowing him to file under § 245.1(c)(8). Respondent argued that the advance parole was invalid because predicated on Akhtar's original fraudulent entry. We do not address the issue because Akhtar concedes on appeal that he is an arriving alien.

[12] *See Succar*, 394 F.3d at 13.

Akhtar and Salman reply that Respondent cannot by regulation redefine eligibility defined by Congress, despite his unreviewable discretion once the applications are filed. Hence the heart of this case: how to resolve the inherent tension in a statutory scheme that explicitly defines who is eligible to apply but gives Respondent unreviewable discretion to review the applications.

## III. Jurisdiction

Respondent argues first that 8 U.S.C. § 1252(a)(2)(B), the provision precluding judicial review of discretionary orders, including orders granting or denying adjustment of status, bars our consideration of petitioners' claim. Like our five sister circuits that have addressed the validity of § 245.1(c)(8),[13] we reject this argument because the issue here is one of statutory interpretation, a pure legal task distinct from review of an individual decision on the merits of an application for adjustment. That our analysis centers on the effect of Respondent's discretion does not change this result.

## IV. Previous Challenges to § 245.1(c)(8)

---

[13] *See Succar v. Ashcroft*, 394 F.3d 8, 19-20 (1st Cir. 2005) (holding that we have jurisdiction); *Zheng v. Gonzales*, 422 F.3d 98, 111 (3d Cir. 2005) (same); *Mouelle v. Gonzales*, 416 F.3d 923, 927-29 (8th Cir. 2005) (assuming that we have jurisdiction); *Bona v. Gonzalez*, 425 F.3d 663, 667-669 (9th Cir. 2005) (same); *Scheerer v. Attorney General*, __ F.3d __, Nos. 04-16231 & 05-11303, 2006 WL 947680, at *5-*8 (11th Cir. Apr. 13, 2006) (same).

9

Until recently, we had not examined this issue.[14]  In an opinion issued after oral argument in our case, *Momin v. Gonzalez*, another panel of this court addressed it head-on and upheld the regulation, as we do.[15]  Our opinion builds upon *Momin*, as we will explain.

Five of our sister circuits have passed on § 245.1(c)(8). The First Circuit lead, invalidating the regulation in *Succar v. Ashcroft*[16] after concluding that it violated *Chevron* step one[17] because discretion to adjudicate individual applications is not discretion to *re*define eligibility, citing *INS v. Cardoza-Fonseca*.[18]  It held that while an agency may use its discretion to define eligibility where Congress was silent on eligibility, citing *Lopez v. Davis*,[19] Congress was not silent here – § 1255

---

[14] We had cited the regulation in an unpublished opinion, where the petitioner never challenged its legitimacy, *see Doria v. Ashcroft*, 98 Fed. Appx. 352 (5th Cir. 2004), and in another unpublished opinion we had held the argument waived, *see Diarra v. Gonzales*, 137 Fed. Appx. 627 (5th Cir. 2005).

[15] ___ F.3d ___, No. 05-60119, 2006 WL 1075235 (5th Cir. Apr. 24, 2006).

[16] 394 F.3d 8 (1st Cir. 2005).

[17] *See Chevron U.S.A., Inc. v. Nat. Res. Defense Council, Inc.*, 467 U.S. 837 (1984) (formulating the classic two-step process for evaluating the validity of regulations).  Step one asks whether Congress has spoken to the precise question at issue; if so, the inquiry ends and Congress's wishes control.  If the statute is silent or ambiguous, step two asks whether the agency's interpretation is "permissible," or reasonable.  *Id.* at 842-43.

[18] 480 U.S. 421 (1987).

[19] 531 U.S. 230 (2001).  In *Lopez*, a statute allowed the Bureau of Prisons (BOP) to decrease the sentence of a prisoner who completed a treatment program by up to a year.  BOP promulgated a regulation categorically denying reduction to any prisoner whose current offense was a drug felony involving a gun.  The Supreme Court upheld the regulation as "delineat[ing]...an additional category of ineligible inmates," noting that "Congress simply did

10

explicitly states who is eligible and creates many carve-ins and carve-outs, highlighting the lack of a carve-out for parolees in removal proceedings.[20] Moreover, the court observed, since most parolees are now put in removal proceedings, § 245.1(c)(8) effectively makes all parolees ineligible.[21] The court also noted the larger statutory context, concluding that its explicit grants of discretion highlight the lack of discretion over eligibility. Checking this interpretation against the legislative history of § 1255 from 1960,[22] the court concluded that § 245.1(c)(8) re-institutes the burdensome procedure that § 1255 was designed to eliminate. Finally, the court rejected Respondent's contention that the IIRIRA justifies the regulation, noting that the IIRIRA left § 1255 untouched and that the general policies said to be embodied by the IIRIRA are doubtful, and in any event insufficient to justify such a sharp break from

---

not address how the Bureau should exercise its discretion within the class of inmates" who are eligible. It noted that "[b]eyond instructing that the Bureau has discretion to [reduce sentence], Congress has not identified any further circumstance in which the Bureau either must grant the reduction, or is forbidden to do so." *Id.* at 714.

[20] The court noted that some of the carve-outs made ineligible certain, but not all, aliens in removal proceedings. It also explained that the carve-outs and ins were added over the years, stressing the lack of Congressional will to make ineligible all parolees in removal proceedings.

[21] The court rejected Respondent's contention that paroled aliens in removal proceedings could simply return to their home countries to apply, noting statutory barriers if the aliens were unlawfully present in the United States for certain periods of time or departed "involuntarily." Respondent urges that these barriers are waivable in his discretion.

[22] The court noted that some people question whether legislative history should be analyzed during *Chevron* step one, concluding that it should.

11

previous practice.

The Eighth Circuit followed with *Mouelle v. Gonzales*,[23] rejecting *Succar* and upholding the regulation.  It held first that *Chevron* step one did not control because § 1255(a) gave Respondent discretion to adjust status, and such discretion can be exercised case-by-case or by rule.  For this proposition it cited its own case *Bellis v. Davis*,[24] affirmed in *Lopez*, and Judge Friendly's statement about § 1255 that "We are unable to understand why there should be any general principle forbidding an administrator, vested with discretionary power, to determine by appropriate rulemaking that he will not use it in favor of a particular class on a case-by-case basis...."[25]  It rejected *Succar*'s interpretation of *Cardoza-Fonseca*, acknowledging that *Cardoza-Fonseca* distinguished statutory eligibility but noting that its context was materially different.[26]  Turning to *Chevron*

---

[23] 416 F.3d 923 (8th Cir. 2005).  Judge Bye dissented, explaining that he would follow *Succar*.

[24] 186 F.3d 1092, 1094-95 (8th Cir. 1999).

[25] *Fook Hong Mak v. INS*, 435 F.2d 728, 730 (2d Cir. 1970).

[26]     The BIA in Cardoza-Fonseca had construed the statutory eligibility standard for asylum (a form of discretionary relief) as requiring the same showing — a clear probability of persecution — as the statutory eligibility standard for withholding of deportation (a form of relief that must be given to an eligible alien).  The Court reasoned that the BIA's construction did not fit the statutes because the difference between the nature of the relief available under each — discretionary versus mandatory — evinced a congressional intent that the eligibility standard for discretionary asylum would be less demanding than the eligibility standard for mandatory withholding.

12

step two, the court held § 245.1(c)(8) reasonable as a means to expedite removal proceedings. Finally, the court noted that, unlike *Succar*, it had no evidence that most parolees were put in removal proceedings; to the contrary, Respondent had stated that few were put in removal proceedings. In any event, the court stated, the number is irrelevant.

Next came *Zheng v. Gonzales*, where the Third Circuit invalidated the rule, albeit under *Chevron* step two.[27] The court first rejected *Succar*'s rationale, holding that its distinction between eligibility and case-by-case discretion was rejected by the Court in *Lopez*[28] and that *Succar*'s basis for distinguishing *Lopez* — that the statute in *Lopez* was silent as to eligibility criteria — came "perilously close to rejecting" that case.[29] It then held that *Lopez*, though swaying in Respondent's favor by

---

> But the Court did not hold that the Attorney General
> could not by regulation determine who among the class
> of aliens that is statutorily eligible for
> discretionary relief would or would not be afforded
> such relief. It simply held that the BIA's
> interpretation of the statute in that case failed
> because Congress did not intend the heightened
> mandatory-withholding showing to apply to
> discretionary asylum.

*Mouelle*, 416 F.3d at 929-930 (internal citations omitted).

[27] *Zheng v. Gonzales*, 422 F.3d 98 (3d Cir. 2005).

[28] *Zheng* noted that the losing prisoner in Lopez had argued "that, by identifying a class of inmates eligible for sentence reductions...Congress has barred the [BOP] from identifying further categories of ineligible inmates." *Id.* at 116. In addition, the court implicitly held that *Carcoza-Fonseca* is distinguishable for the reasons stated by the Eighth Circuit.

[29] *Id.* n.14.

13

allowing him to exercise discretionary authority by rule, was a "double-edged sword" in putting that discretionary authority "squarely within the second step" of *Chevron*.[30]  Turning to step two, the court focused on the percentage of parolees put in removal proceedings.  Although it had no statistics, it noted those cited in *Succar* and held that, more importantly, the statutory structure seems to *mandate* that parolees be put in removal proceedings, regardless of Respondent's claim to discretion.[31]  Noting that the exception allowing parolees in removal proceedings to renew applications was narrow, and that "renewing" was not "applying," the court held that § 245.1(c)(8) "for all practical purposes" renders parolees ineligible to apply.  Citing the language, structure, and legislative history of the immigration statutes, the court explained that Congress clearly intended in § 1255 that most parolees could apply.  Given this conflict, it struck down the regulation.  In doing so, it noted that the "closeness of the step one question ha[d] some bearing on [its] step two decision."

---

[30] The court noted that the Supreme Court in *Lopez* analyzed the BOP's exercise of discretion by rule under *Chevron* step two.

[31] The court noted that under 8 U.S.C. § 1101(a)(13)(B), parolees are not "admitted aliens" but "applicants for admission."  And under § 1225(b)(2)(A), applicants for admission "shall be detailed for a [removal] proceeding" if an officer determines they are "not clearly and beyond a doubt entitled to be admitted."  Since parole is a form of relief from detention, not removal, the court believed that Respondent must put into removal proceedings all aliens "not clearly and beyond a doubt entitled to be admitted," regardless of whether he paroles them.  In any event, it held, even if Respondent had discretion not to remove such parolees, Congress's clear intent to foster removal would greatly limit that discretion.

14

The Ninth Circuit held the regulation invalid in *Bona v. Gonzales* after succinctly and expressly adopting *Succar* and rejecting *Mouelle*.[32] The Eleventh Circuit ruled last in *Scheerer v. Attorney General*, expressly adopting the rationale of *Zheng*.[33]

## V. Validity of § 245.1(c)(8)

We agree with *Mouelle* that § 245.1(c)(8) passes both *Chevron* hurdles. Congress did not speak precisely to the issue because it gave Respondent unreviewable discretion to adjudicate individual applications. And there is simply no reason why an agency given such discretion cannot exercise it by rule. *Lopez* concurs, and we find *Succar*'s attempt to distinguish that case unconvincing for the reasons explained by *Zheng*. Furthermore, as explained in *Mouelle*, *INS v. Cardoza-Fonseca* does not create some artificial distinction between eligibility and case-by-case discretion such that the latter cannot *de facto* affect, or even "redefine," the former. It merely "held that the BIA's interpretation of the statute in that case failed because Congress did not intend the heightened mandatory-withholding showing to apply to discretionary asylum."[34]

---

[32] 425 F.3d 663 (9th Cir. 2005)

[33] __ F.3d __, Nos. 04-16231 & 05-11303, 2006 WL 947680, at *7 (11th Cir. Apr. 13, 2006).

[34] *Mouelle*, 416 F.3d at 929-930.

15

Turning to step two, § 245.1(c)(8) is a reasonable method of exercising that discretion to facilitate removal. The statutory structure and history are insufficient to render it unreasonable because they also highlight Congress's intent to give Respondent unreviewable discretion. That is, while Congress certainly intended to define who is eligible to apply, it just as clearly intended to let Respondent deny many, some, or all applications.[35] Given the tension between those intents, we cannot say that Respondent's interpretation is "unreasonable" under *Chevron*.

We are cautioned to mind the practical effect of striking down § 245.1(c)(8). The question is put, couldn't the Government achieve the same result by instructing all IJs or District Directors to deny all applications from paroled aliens in removal proceedings after allowing such aliens the formality of applying? *Succar* responds that while its holding does not "preclude [Respondent] from adopting a uniform set of criteria for

---

[35] We note the disagreement over what percentage of paroled aliens are in removal proceedings. Respondent in *Moulle* suggested 2-3%, while *Succar* thought the number large and *Zheng* thought it 100%. The evidence in our case is unclear, although Respondent stated at oral argument that it is less than 100%. In any event, the number is irrelevant because Respondent has discretion to forbid applications from all paroled aliens in removal proceedings, or all paroled aliens, or all aliens "inspected and admitted," or all aliens "inspected and admitted or paroled." The size of the precluded subset is irrelevant, even to the point of the "subset" being the entire set defined in § 1255. In upholding the regulation, a recent panel of this court explained that it had no evidence of the size of the subset; furthermore, it noted that in practice not all paroled aliens were put in removal proceedings. *Momin*, 2006 WL 1075235, at *12-*13. We hold the regulation valid *even if* all paroled aliens were put in removal proceedings.

16

consideration in evaluating applications," Respondent "cannot categorically refuse to exercise discretion favorably for classes deemed eligible by the statute," although whether an eligible alien is in removal proceedings can be a "consideration in the weighing."[36] But that restraint on Respondent's discretion is unclear, requiring the federal courts to police adjudications on a low level, if not case-by-case,[37] in contravention of § 1252(a)(2)(B)(i). Respondent's reasonable construction of § 1255 allows us to avoid that morass.

We conclude that § 245.1(c)(8) is valid under *Chevron*. Respondent has discretion to adjudicate applications for adjustment of status, and he has done so by a reasonable rule.[38]

### VI. Akhtar's Remaining Claims

We have disposed of petitioners' primary claim. Akhtar makes two others. First, he argues that we should "initiate" conditional termination of removal proceedings to allow adjudication of his application for adjustment of status. He

---

[36] *Succar*, 394 F.3d at 29 n.28 (citing *Lopez*, 531 U.S. at 249 (Stevens, J., dissenting)). Petitioners in our case contended similarly at oral argument.

[37] At the very least, we would have to inquire whether the set of criteria promulgated by Respondent "categorically refuse[d]" as a practical matter eligibility to an otherwise eligible class. Would precluding 90% of the class invalidate the criteria? 95%? And even if the criteria were acceptable, but nobody in the class received relief, would we have to inquire whether some unofficial rule or practice was improperly influencing the exercise of discretion?

[38] We do not rely on the IIRIRA in upholding the regulation. Respondent could have validly promulgated § 245.1(c)(8) before the enactment of that statute.

cites no authority for this request, and, finding no basis for terminating removal proceedings, we dismiss that claim for lack of jurisdiction.  Second, he urges us to reverse the IJ's denial of his application for cancellation of removal.  Following our precedent, we conclude that we cannot review that discretionary determination and dismiss that claim for lack of jurisdiction as well.[39]

We AFFIRM the judgments of the Board of Immigration Appeals.

---

[39] *See Moosa v. INS*, 171 F.3d 994, 1011-12 (5th Cir. 1999).