**Besnik RUKIQI, Petitioner**

v.

**ATTORNEY GENERAL OF the UNITED STATES; Bureau of Citizenship and Immigration Services; Department of Homeland Security, Respondents.**

No. 05–3979.

United States Court of Appeals, Third Circuit.

Argued May 10, 2007.

Filed: Aug. 31, 2007.

David E. Oltarsh, Jennifer M. Oltarsh, (Argued), Oltarsh & Associates, P.C., New York, NY, for Petitioner.

Douglas E. Ginsburg, John D. Williams, (Argued), U.S. Department of Justice, Office of Immigration Litigation, Washington, DC, for Respondent.

Before: RENDELL, JORDAN and ALDISERT,* Circuit Judges.

## OPINION OF THE COURT

RENDELL, Circuit Judge.

Besnik Rukiqi petitions from the BIA's denial of his Motion to Reopen his asylum case, which the IJ and BIA previously had denied as untimely. He alleges that the BIA abused its discretion in denying his Motion to Reopen, which was based on a claim of ineffective assistance of counsel. We have jurisdiction under 8 U.S.C. § 1252(a)(1). Mindful of the heavy burden an alien bears on a motion to reopen, we will deny the petition.

## I.

Besnik Rukiqi is a citizen of Serbia—a native of the province of Kosovo—who contends he faces persecution there by Serbians on account of his Albanian background and pro-Albanian sentiment.[1] He maintains that he was arrested in 1988 and held for two weeks, during which time he was brutally beaten and, thereafter, regularly stopped and harassed by the police. In 1998, he states that Serbians began killing and "disappearing" ethnic Albanians and burning Albanian villages. In April 1999, after his father had been killed, Rukiqi states that he and his brother fled to the mountains where they survived for two months, "nearly starving to death." App. 10. They returned to their village after NATO troops arrived in June 1999, finding their house had been burned and many male relatives and friends killed. Even after NATO's arrival, Rukiqi states that he faced continued threats from Serbians as well as from extremist Albanian forces that resented him for fleeing to the mountains rather than fighting. He contends that someone tried to kill him on two occasions in January 2000—once firing shots at him as he was walking down a road. He fled to the United States in April 2000.

Rukiqi states that he hired lawyer Martin Vulaj two months after he arrived in the United States, and that Vulaj assured him he would immediately file an asylum application, along with petitions for withholding of removal and relief under the Convention Against Torture (CAT). After months passed without word from Vulaj, Rukiqi called Vulaj's office to check that his application was on track. He contends that Vulaj told him he had filed the application. Apparently not convinced, Rukiqi later called the office again, but could not make contact with Vulaj. Rather, an employee at Vulaj's office repeatedly told him that Vulaj had filed the application. As the one-year deadline approached, Rukiqi states that he began "incessantly" calling Vulaj's office. App. 3. Two days prior to the one-year deadline, Vulaj's staff summoned him to the office to re-sign the asylum forms and provide new photographs. The staff assured him that his application would be timely filed, but Vulaj filed it three days after the deadline. The Department of Homeland Security then rejected the application because it was incomplete. Vulaj finally filed the completed application two months later.

Another attorney, Timothy Garille, represented Rukiqi before the IJ. An Albanian interpreter, a Mr. Brovac, was sworn, as was Rukiqi. There was an extensive discussion, spanning seven pages of the Administrative Record, R. 184–91, regard-

---

* Honorable Ruggero J. Aldisert, Senior Judge of the United States Court of Appeals for the Third Circuit, appeared via audio conference.

1. Petitioner's brief does not describe in detail the factual basis of his claim, so we draw on the affidavit Rukiqi submitted with his Motion to Reopen.

ing the filing date of the asylum application. Finally, counsel for the Government produced a filed copy that revealed that the application was filed on April 23, 2001—three days late. The IJ asked whether Rukiqi had "any extenuating circumstances to offer the court" that would excuse his late filing. The IJ then recessed the hearing for "a while"—as the IJ described it—so that Garille could discuss this with Rukiqi. R. at 193. After this break, Garille announced to the IJ that he could offer no extenuating circumstances. The IJ consequently denied Rukiqi's asylum application as time-barred. The IJ then heard Rukiqi's testimony in support of his petitions for withholding of removal and relief under CAT, and denied them on substantive grounds. R. at 194–209.

On appeal, Rukiqi was represented by yet another attorney—Linda Flanagan—who, as the Administrative Record suggests, R. at 99, worked for the "Law Offices of Isejn Marku." However, Rukiqi claims that he did not know Marku nor how Marku came to be involved in the case. Brief for Appellant at 4–5. Flanagan's brief, the argument portion of which being barely a page long, did not discuss the IJ's determination that Rukiqi's asylum application was time-barred, nor did it refer to Vulaj's having been ineffective in failing to timely file it. The BIA affirmed the IJ's ruling on October 6, 2003.

Rukiqi retained his current counsel, Jennifer Oltarsh, shortly after the BIA's denial of his appeal and Ms. Oltarsh promptly filed a Motion to Reopen with the BIA. In the motion, Rukiqi alleged that it was from Ms. Oltarsh that he first learned that Vulaj had not timely filed the asylum application and, therefore, that he was deserving of

relief on the basis of extraordinary circumstances—to wit, ineffective assistance of counsel on the part of Vulaj. With the Motion to Reopen, Rukiqi submitted an affidavit describing Vulaj's alleged errors in representation and including a copy of a complaint he sent to the Departmental Disciplinary Committee of the First Judicial Department of New York State. He also included the Committee's reply stating that "Mr. Vulaj ... has resigned from the practice of law" and a copy of an order of the Appellate Division "striking Mr. Vulaj's name from the roll of attorneys admitted to practice in New York State." App. 27. Rukiqi's brief also makes mention of the fact that he also complained about Marku to the Disciplinary Committee and soon thereafter came to understand that Marku "was forced to resign from the practice of law for disciplinary reasons." R. at 15. However, Rukiqi did not advance, and submitted no documentation in support of, an ineffective assistance of counsel claim against Garille, Marku or Flanagan.

The BIA denied relief, stating that it did not believe extraordinary circumstances were present. In doing so, the BIA relied on the fact that Rukiqi failed to establish that the two attorneys who represented him before the IJ and the BIA were ineffective. App. 19 ("Because the record shows that the respondent continued to use these attorneys at his hearing and on appeal and the attorney at the hearing conceded the untimeliness of the asylum request and the lack of extraordinary circumstances, we find that such circumstances undermines his ineffective assistance of counsel claim.").[2] This petition followed.

---

**2.** Additionally, the BIA opined that, even had Rukiqi established extraordinary circumstances, current country conditions in Kosovo reflect that ethnic Albanians face only "some

discrimination ... not rising to the level of persecution." Appx. at 19. Therefore, the BIA held that, were it to allow reopening, Rukiqi could nevertheless not "established a

## II.

As Rukiqi failed to file a petition for review of the BIA's initial denial of his appeal from his asylum application, we review only the BIA's denial of Rukiqi's motion to reopen. We view motions to reopen immigration proceedings "with strong disfavor." *Zheng v. Gonzales,* 422 F.3d 98, 106 (3d Cir.2005). As we observed in *Zheng,* "we review the BIA's decision to deny reopening for abuse of discretion, mindful of the 'broad' deference that the Supreme Court would have us afford." *Id.* (quoting *Xu Yong Lu v. Ashcroft,* 259 F.3d 127, 131 (3d Cir.2001)).

On this appeal, the Government moved for summary affirmance of the BIA's denial of the motion to reopen, arguing that Rukiqi had not challenged the representation by the attorneys who represented him before the IJ and the BIA, namely Garille and Flanagan. This, notwithstanding the fact that it was Garille who made the fatal concession before the IJ conceded that there were no extraordinary circumstances. While the affidavit Rukiqi filed with his motion to reopen indicates that he did not "understand any of the discussion [before the IJ regarding the late filing] and [was] not sure that it was even translated," surely Rukiqi heard the extensive discussion of the tardy filing and had to realize that he had been misled by Vulaj. If neither Garille, before the IJ, nor Flanagan, before the BIA, raised this issue, we cannot conclude that the BIA's unwillingness to reopen Rukiqi's proceedings was abusive.

The reopening of agency proceedings based upon ineffective assistance of counsel depends, initially, upon an asylum seeker's compliance with the requirements of *Matter of Lozada,* 19 I. & N. Dec. 637

prima [facie] showing of eligibility for asy-

(BIA 1988). There, the BIA established that:

> [a] motion based upon a claim of ineffective assistance of counsel should be supported by an affidavit of the allegedly aggrieved respondent attesting to the relevant facts. In the case before us, that affidavit should include [1] a statement that sets forth in detail the agreement that was entered into with former counsel with respect to the actions to be taken on appeal and what counsel did or did not represent to the respondent in this regard. [2] Furthermore, before allegations of ineffective assistance of former counsel are presented to the Board, former counsel must be informed of the allegations and allowed the opportunity to respond. Any subsequent response from counsel, or report of counsel's failure or refusal to respond, should be submitted with the motion. [3] Finally, if it is asserted that prior counsel's handling of the case involved a violation of ethical or legal responsibilities, the motion should reflect whether a complaint has been filed with appropriate disciplinary authorities regarding such representation, and if not, why not.

*Id.* at 639. The BIA stated that such a "high standard" for ineffective assistance of counsel claims is necessary to ensure that administrative records are sufficiently detailed, because "[w]here essential information is lacking, it is impossible to evaluate the substance of [an ineffective assistance of counsel] claim." *Id.*

We considered the permissibility of the *Lozada* requirements in *Xu Yong Lu,* 259 F.3d at 133. In that case, the petitioner "claimed ... his fundamental due process rights" had been violated by the IJ's refusal to reopen his case notwithstanding his contention that ineffective assistance of counsel had stymied his attempt to appeal.

lum." *Id.*

*Id.* at 130. Although we expressed "concer[n] that courts could apply *Lozada*'s third prong so strictly that it would effectively require all petitioners claiming ineffective assistance to file a bar complaint," we upheld the BIA's rule, "conclud[ing] that the *Lozada* requirements are a reasonable exercise of the Board's discretion." *Id.* at 129, 133.

As to Vulaj, Rukiqi's motion to reopen falls far short of *Lozada*'s requirements. Although he submitted an affidavit with his motion to reopen, that affidavit fails to "se[t] forth in detail the agreement that was entered into with former counsel." *Lozada*, 19 I. & N. Dec. at 639. In the affidavit, Rukiqi refers to Vulaj as "my counsel," but says nothing about the substance of Vulaj's agreement to represent Rukiqi. Additionally, the motion to reopen does not establish that Rukiqi informed Vulaj of his dissatisfaction—*Lozada*'s second requirement. *See id.* Although Rukiqi suggests otherwise in his brief on appeal, the administrative record contains no evidence that Rukiqi sent Vulaj a copy of his formal complaint or otherwise informed him of his discontent.

Additionally, as the BIA noted, Rukiqi has not even attempted to satisfy *Lozada* as to the two lawyers who actively represented him before the IJ and the BIA: Garille and Flanagan. This is not a minor point. On Rukiqi's behalf—and, indeed, right in front of him—Garille conceded that Rukiqi stated he could offer no extraordinary circumstances that would excuse the late filing of his asylum application. Then, in her brief to the BIA, Flanagan failed to raise the issue altogether. In sum, Rukiqi's counsel conceded that his asylum application was filed late, and then never pursued any challenge to this finding on appeal to the BIA. In his motion to reopen, Rukiqi failed to even refer either to Garille or Flanagan's representation, much less argue that they were ineffective. The BIA's view—that Rukiqi's motion was flawed because it did not claim ineffectiveness as to Rukiqi's counsel who conceded, and then waived, the argument that there were extraordinary circumstances to excuse the delay in Rukiqi's filing—was not an abuse of discretion.[3]

Yet Rukiqi suggests, and the dissent argues, that Garille and Flanagan may have failed to raise an extraordinary circumstances argument based on Vulaj's ineffectiveness out of an unethical allegiance toward Vulaj. The evidence on this point is non-existent.[4] However, even if true, it

---

**3.** The dissent argues that "[w]hile [the BIA's opinion] might be read to say that Rukiqi did not meet the Lozada requirements with respect to Garille, Flanagan, and Marku, it is not a holding that Rukiqi failed to meet the Lozada requirements with respect to Vulaj." Dissent at 20–21. Therefore, in the dissent's view, "it was an abuse of discretion for the BIA to deny Rukiqi's motion to reopen on the grounds that, of the lawyers from Vulaj's firm who represented Rukiqi, only Vulaj ended up disbarred." Dissent at 11. However, the BIA's decision, as well as a substantial portion of this opinion, is premised on the idea that, *even had* Rukiqi met the *Lozada* requirements with respect to Vulaj, he also had an obligation to meet them with respect to those additional attorneys who actively represented

him before the BIA. The dissent simply has no response to the argument that Rukiqi failed to meet this obligation and that his failure to do so dooms his motion to reopen.

**4.** This theory is based upon the assertion that Vulaj, Marku, Garille and Flanagan were all members of the same law firm. We do not agree that the record supports this theory, especially given that, at oral argument before this Court, counsel for Rukiqi twice conceded that the record contained nothing explaining any potential relationship. The dissent arrives at this conclusion by examining letterhead, and other bits of information included in the Administrative Record. The BIA's observation as to the association between Vulaj and Marku, Flanagan and Garille, on which

constitutes a claim of ineffectiveness on the part of Garille and Flanagan. To say that Garille and Flanagan purposefully failed to raise an argument about Vulaj's ineffectiveness is to say that both attorneys were, themselves, ineffective. However, to establish such a claim in the immigration context, an alien must first satisfy *Lozada*. Although the dissent may disagree with the stringency with which we demand that Rukiqi adhere to *Lozada* as to Vulaj, there can be no doubt that, with respect to Garille and Flanagan, Rukiqi has failed to satisfy *Lozada* even under the most relaxed application possible. Indeed, Rukiqi has not tried to satisfy *Lozada* at all.

In short, we are left with a situation in which Petitioner had to know of an ineffectiveness claim and then waived it by failing to assert it before the BIA or in his motion to reopen. We cannot nullify the BIA's ruling based on an argument not presented to it and, therefore, we find no abuse of discretion.

We are not employing the sort of "strict, formulaic interpretation of *Lozada*" that we expressed concern about in *Xu Yong Lu v. Ashcroft*, 259 F.3d 127, 133 (3d Cir. 2001). This is not a case of a petitioner brought down because he fell short of a single *Lozada* requirement; it is a case of a petitioner who failed to act when he first knew of counsel's failures and did not fulfill multiple requirement as to one attorney and all of the requirements as to the other attorneys involved in his case. As in *Xu Yong Lu*, 259 F.3d at 135, "[i]f we were to accept [Petitioner's] arguments, we would seriously undermine the BIA's ability to assess the 'substantial number' of claims it receives, and thus frustrate the stated goal of *Lozada*."

Accordingly, we will DENY the Petition for Review.

JORDAN, Circuit Judge, dissenting.

Because I believe the majority's opinion does indeed apply the type of "strict, formulaic interpretation of *Lozada*" that we warned against in *Lu v. Ashcroft*, 259 F.3d 127, 133 (3d Cir.2001), and because I believe the petitioner's due process rights have been violated, I must respectfully dissent.

### I.

Besnik Rukiqi, an ethnic Albanian from Kosovo, in what is now the Republic of Serbia, entered the United States on April 22, 2000.[5] He applied for asylum, claiming that he and his family had been persecuted in Kosovo by the Serbian government. As the majority sets out, Rukiqi claims that he and his family were repeatedly threatened by the police. According to the evidence he presented, he was arrested in 1989, beaten, questioned about his family's political activities, and detained. His problems with the police resurfaced on April 27, 1999, when, he says, they forced him from his home at gun point. His father was killed soon thereafter, and he and his brother escaped to the mountains, where they nearly starved. Rukiqi then fled to the U.S.

Rukiqi asserts that, two months after he arrived in the United States, he hired Martin Vulaj to file his asylum application.

---

the dissent relies, is no more than a parenthetical assumption. *See* Dissent at 3 (quoting Appx. at A18).

**5.** Rukiqi's entry date is different on two copies of the asylum application filed on his behalf. The date April 24 is typed on the form, but on the copy submitted as Exhibit 2 to the Immigration Judge, that date is scratched out and April 22 is handwritten. At his hearing, it was apparently established that Rukiqi entered on April 22.

That assertion is supported by the administrative record, which shows that Vulaj or someone working for him prepared an asylum application on Rukiqi's behalf. The date on the signature line of the application is June 29, 2000, approximately two months after Rukiqi entered the country. As the majority states, Rukiqi claims that he repeatedly called Vulaj's office over a period of months because he never heard from either Vulaj or the INS about his application. Vulaj at first assured him that the application had been filed. Later, Vulaj would not return his calls, but an employee of Vulaj's office continued to tell Rukiqi that the application was in the government's hands. Two days before the one-year filing deadline for the application, Rukiqi received a call from Vulaj's office telling him to come in and sign the application forms again because the application had to be "resubmitted." He went to the office, signed a new set of papers, provided new photographs, and was promised that the application would be filed immediately. Despite that assurance, however, the application was not filed until April 25, 2001, three-days after the filing deadline.[6]

Vulaj was not present at any of Rukiqi's hearings before the Immigration Judge ("IJ"), nor did he participate in the appeal before the Board of Immigration Appeals ("BIA"). In fact, Rukiqi had never previously met the attorneys who purported to represent him at his hearings before the IJ and on appeal before the BIA. At the hearing before the IJ on May 22, 2002, Rukiqi was represented by Timothy Garille. He was also represented by Linda Flanagan at hearings on December 20, 2001 and February 7, 2002. On appeal to the BIA, he was represented by Flanagan and Isejn Marku. Despite the majority's assertion to the contrary, *ante* at ——, there is evidence in the record to indicate that Flanagan, Garille, and Marku all worked with Vulaj in the same law firm during at least part of the time relevant here. First, the BIA itself noted that the attorneys who represented Rukiqi at his hearing and on appeal "were associated with the firm [Vulaj] practiced with[.]" Appx. at A18. The majority readily disregards this observation by the BIA, in a remarkable 180–degree reversal from the deference they give the BIA throughout the rest of the opinion. Furthermore, evidence in the record supports the BIA's observation. *See* Administrative Record ["AR"] at 96 (Letter from Linda Flanagan to the BIA on "Vulaj & Marku" letterhead); Appendix ["Appx."] at A31 (later brief to the BIA signed by Linda Flanagan "For the Law Offices of Isejn Marku"); AR 182 (Garille stating he was from the firm of "Laura (indiscernible) Makoo (phonetic spelling)", which seems to refer to "Vulaj & Marku"). To the majority, these "bits of information," *ante* at n. ——, amount to no evidence at all, but they persuade me, as they did the BIA, that Vulaj, Marku, Flanagan, and Garille all worked together in the same law firm.

At the May 22, 2002 hearing, Garille was unaware of when Rukiqi's asylum application had been filed. When the attorney for the government noted that Rukiqi's application was filed three days late, the IJ asked Garille whether there were any extraordinary circumstances to justify the late filing. Garille agreed that the asylum application was untimely and stated that he did not "have any extenuating circumstances to offer to the Court ... [f]or this seemingly [sic] failure to comply with the one year rule." Accordingly, in his oral opinion, the IJ noted that "[t]he respondent has not contested ... the date nor the circumstances surrounding his failure

---

6. Even filed late, the application was incomplete, and it was refiled on June 21, 2001.

[to timely file his asylum application] and in fact does not offer any explanation for the failure to file." [7]  The IJ thus found that asylum was unavailable to Rukiqi.

The BIA affirmed the IJ's decision. The BIA agreed that the asylum application was late and that Rukiqi was not entitled to withholding of removal or relief under the Convention Against Torture.

After hiring new lawyers, Rukiqi filed a motion to reopen his case with the BIA. In his accompanying affidavit, Rukiqi described the circumstances of his asylum application, including that he had hired Vulaj two months after he entered the country, that Vulaj had repeatedly assured him that his application had been filed, and that he learned of the late filing of his application only after he had hired a new lawyer. Rukiqi stated that his "attorney's outright misleading and lying to [him] are extraordinary circumstances that warrant that [his] case be reopened." In the motion itself, Rukiqi alleged ineffective assistance of counsel on the part of Vulaj, based on the allegations set forth in the affidavit.

On March 2, 2004, the BIA denied Rukiqi's motion to reopen. The BIA noted that

[i]n support of his ineffective assistance of counsel claim, [Rukiqi] submitted his affidavit alleging that [he] was timely in asserting his asylum claim but that the attorney delayed in filing the application. [He] also submitted a complaint

regarding the attorney, Martin Vulaj, to local bar authorities and also submitted correspondence from the bar officials stating that Mr. Vulaj has resigned from the practice of law. [He] also detailed the basis of his asylum claim in his affidavit.

The BIA, nevertheless, found that Rukiqi had not established extraordinary circumstances to justify the late application.

First, according to the BIA,

[t]he record reflects that at his hearing and on appeal, [Rukiqi] was represented by other attorneys, not the one disbarred (although they were associated with the firm he practiced with) and [Rukiqi] has not established ineffective assistance on their part. Because the record shows that [he] continued to use these attorneys at his hearing and on appeal and the attorney at the hearing conceded the untimeliness of the asylum request and the lack of extraordinary circumstances, we find that such circumstances undermine his ineffective assistance of counsel claim.

Second, the BIA found

that even if [Rukiqi] established extraordinary circumstances within the scope of 8 C.F.R. § 1208.4(a)(5)(iii), he has not established a prima facie showing of eligibility for asylum. The United States Department of State Country Reports

---

**7.** Rukiqi claims that he did not understand that discussion between Garille and the IJ, and that he did not know what had happened until after his appeal was denied and he spoke with another attorney. The majority implies that this claim is incredible because the record indicates that Rukiqi and Garille conferred for "a while." *Ante* at ——. However, the majority's implication requires the assumption that Garille communicated accurately the import of the "extraordinary circumstances" question to Rukiqi. It also requires one to believe that, knowing he was forfeiting the hearing he'd been struggling to

get, Ruqiki concurred in Garille's concession that there were no extraordinary circumstances justifying the delay. While the majority opines that "surely Rukiqi heard the extensive discussion of the tardy filing and had to realize that he had been misled by Vulaj," *ante* at ——, the only thing that appears sure to me from the record of the hearing is that the lawyer supposedly representing Rukiqi's interests made a concession about the late filing because he was either unwilling or unable to describe the truly extraordinary circumstances that the record shows did exist.

for Yugoslavia for 2000 and 2001 submitted by [Rukiqi] disclose that ethnic Albanians presently face at most some discrimination not rising to the level of persecution. Consequently for this reason also we find that reopening is not warranted.

## II.

The majority holds that we cannot reopen Rukiqi's case because he failed to comply with the BIA's procedural requirements for stating an ineffective assistance of counsel claim, as set forth in *Matter of Lozada*, 19 I. & N. Dec. 637, 638 (BIA 1988). Those requirements are:

(1) that the claimant submit an affidavit setting forth the relevant facts, including the agreement with counsel about the scope of representation;

(2) that he inform counsel of the allegations and allow counsel an opportunity to respond; and

(3) that he state whether a complaint has been filed with bar authorities, and if not, why not.

*Lu*, 259 F.3d at 132. We have held that it is within the BIA's broad discretion to impose those requirements. *Id.* at 133. But, we have also recognized that "[t]here are inherent dangers ... in applying a strict, formulaic interpretation of *Lozada*." *Id.*; *see also Fadiga v. Attorney General U.S.*, 488 F.3d 142, 156 (3d Cir.2007) (reaffirming *Lu*'s warning about the "dangers ... in applying a strict, formulaic interpretation of *Lozada*[.]"); *Castillo–Perez v. I.N.S.*, 212 F.3d 518, 526 (9th Cir.2000) ("*Lozada* is intended to ensure both that an adequate factual basis exists in the record for an ineffectiveness complaint and that the complaint is a legitimate and substantial one. Here, the record of the proceedings themselves is more than adequate to serve those functions."). For example, we have said that the need to file a disci-

plinary complaint with regulatory authorities "is not an absolute requirement," and we have further "stress[ed] that the failure to file a complaint is not fatal if a petitioner provides a reasonable explanation for his or her decision." *Lu*, 259 F.3d at 134; *see also Castillo–Perez*, 212 F.3d at 526 ("while the requirements of *Lozada* are generally reasonable, they need not be rigidly enforced where their purpose is fully served by other means."). In short, *Lozada* is not supposed to be the Procrustean bed it has become in this case.

The majority holds, in accordance with the government's argument, that the first *Lozada* requirement has not been satisfied because, although Rukiqi submitted an affidavit with his Motion to Reopen, he failed to set forth the details of his agreement with Vulaj. I disagree that there is inadequate detail here. Rukiqi's affidavit, amply supported by the record on this point, shows that Rukiqi retained Vulaj to file his asylum application. Rukiqi states that he hired Vulaj two months after entering the United States. Indeed, Rukiqi's asylum application, dated June 29, 2000, bears a signature purporting to be Vulaj's on a signature line for the "application preparer." Rukiqi also details his phone calls to Vulaj, responses he got from Vulaj and Vulaj's staff, and the trip he made to Vulaj's office just two days before the filing deadline so that his asylum application could be "resubmitted." The record also contains evidence showing that attorneys from Vulaj's firm represented Rukiqi at his hearings and in his initial appeal to the BIA. It thus appears clear to me that Rukiqi has satisfied the first *Lozada* requirement, as the record demonstrates without contradiction that he retained Vulaj to represent him in the process of obtaining asylum.

The majority also says that Rukiqi did not satisfy the second *Lozada* require-

ment, since "the motion to reopen does not establish that Rukiqi informed Vulaj of his dissatisfaction...." *Ante* at 123. Notably, the government did not raise this argument in its Motion for Summary Affirmance, perhaps because it recognized, as I do, that the unrebutted record does indicate that Rukiqi tried to advise Vulaj of his complaint to the New York bar, but that Vulaj could not readily be contacted since he had been ousted from the practice of law.[8] It is thus neither surprising nor unreasonable that Rukiqi has been unable to contact him.[9]

Finally, the record shows that Rukiqi filed a complaint with the Disciplinary Committee of the New York Supreme Court, Appellate Division, outlining his allegations of Vulaj's incompetence and deception. As noted, Rukiqi received a response from the Committee informing him that Vulaj had "resigned from the practice of law," and enclosing the "order of the Appellate Division, First Judicial Department striking Mr. Vulaj's name from the roll of attorney's admitted to practice in New York State." Thus, Rukiqi fulfilled the first and third *Lozada* requirements, and made a reasonable though frustrated effort to fulfill the second. Because we

are not supposed to apply a "strict, formulaic interpretation of *Lozada* [,]" I disagree with the majority's conclusion that Rukiqi's "motion to reopen falls far short of *Lozada*'s requirements." *Ante* at 124. It appears, on the contrary, to adequately meet the letter of *Lozada*, and, importantly, to fully meet the spirit of the policy behind that precedent.

It is worth observing that the BIA did not deny Rukiqi's motion because he failed to satisfy the procedural requirements of *Lozada*. In fact, the BIA did not mention *Lozada* anywhere in its opinion. The BIA did cite 8 C.F.R. § 1208.4(a)(5)(iii), the regulatory section that sets out the *Lozada* requirements, for the proposition that Rukiqi had "not established extraordinary circumstances for failure to timely [file] his asylum claim." (A–18.) The BIA then went on to say that only Vulaj was disbarred, that Rukiqi was represented by other attorneys, and that he did not allege that those attorneys were ineffective. (A–18–19.) While this might be read to say that Rukiqi did not meet the *Lozada* requirements with respect to Garille, Flanagan, and Marku, it is not a holding that Rukiqi failed to meet the *Lozada* requirements with respect to Vulaj.[10]

---

8. The letter from the Disciplinary Committee of the New York Supreme Court, Appellate Division is carefully neutral in describing Mr. Vulaj's name being stricken from its roll of practicing attorneys, but the BIA read this—probably with good reason—as tantamount to disbarment, given the circumstances here.

9. Additionally, the reason that the BIA has given for establishing this requirement is to prevent abuse of ineffective assistance of counsel claims by "allowing former counsel, whose integrity or competence is being impugned, to present his version of events if he so chooses[.]" *Lozada*, 19 I. & N. Dec. at 639. Here, however, it seems Vulaj has already declined to defend his integrity and competence before the New York bar and has chosen instead to have his name stricken from the roll of attorneys.

10. The majority states that, *"even had* Rukiqi met the *Lozada* requirements with respect to Vulaj, he also had an obligation to meet them with respect to those additional attorneys who actively represented him before the BIA."* (Ante at n. 3; original emphasis.) It goes on to say that "[t]he dissent simply has no response to the argument that Rukiqi failed to meet this obligation and that his failure to do so dooms his motion to reopen." (*Id.*) On the contrary, there is a response and I have endeavored to give it appropriate emphasis: it appears to me from the record, as it appeared to the BIA, that Marku, Garille, and Flanagan were all associated with Vulaj in the practice of law during the time of Vulaj's malfeasance. My argument is simply that, under these circumstances, the *Lozada* showing as to Vulaj suffices to cover the Vulaj

### III.

Because I would hold that we have jurisdiction to review Rukiqi's motion to reopen, and that Rukiqi has fulfilled the *Lozada* requirements, I would also consider the merits of his motion to reopen. We review a denial of a motion to reopen for abuse of discretion. *Ezeagwuna v. Ashcroft*, 325 F.3d 396, 409 (3d Cir.2003). The BIA's decision must be upheld unless "it is arbitrary, irrational, or contrary to law." *Sevoian v. Ashcroft*, 290 F.3d 166, 174 (3d Cir.2002) (internal quotation marks omitted). For the following reasons, I believe the BIA abused its discretion in denying the motion to reopen.

### A.

The BIA found that Rukiqi had not established extraordinary circumstances for failure to timely file his asylum claim, as required by 8 C.F.R. § 1208.4(a)(5)(iii). It reasoned that, even if Vulaj provided Rukiqi with ineffective assistance of counsel, Rukiqi had been represented by three other attorneys who had not been disbarred. In light of the record, however, that conclusion is unfounded and arbitrary.

Garille, Flanagan, and Marku, the three lawyers who represented Rukiqi at his hearings before the IJ and on appeal to the BIA, were apparently all associated with Vulaj before he left, or was driven from, the practice of law. *See supra* at Section I. Thus, each had a conflict of interest that prevented him or her from appropriately addressing whether Vulaj was responsible for the travesty of legal representation that Rukiqi claims led to his asylum application being untimely. Vulaj's partners or employees could not rightly be expected to answer the question posed by the IJ about extraordinary circumstances to justify the late filing.

colleagues who failed to point out that mal-

Though there are people of great integrity who acknowledge facts to their own detriment, we do not generally count on a lawyer confessing a partner's or employer's malpractice, along the lines of saying, "Why, yes; my colleague repeatedly lied to Mr. Rukiqi and led him to believe his asylum application was timely filed, though it wasn't. That's the extraordinary circumstance that justifies the late filing of the application." Consequently, it was an abuse of discretion for the BIA to deny Rukiqi's motion to reopen on the grounds that, of the lawyers from Vulaj's firm who represented Rukiqi, only Vulaj ended up disbarred.

### B.

The BIA also found that, even if Rukiqi had established extraordinary circumstances through his claim of ineffective assistance of counsel, he failed to show a prima facie case of eligibility for asylum. However, the BIA gave no indication that it had considered the evidence Rukiqi submitted. His affidavit describes his arrest for participation in a protest, and his having been "brutally beaten" during a two-week incarceration. He also describes a history of being severely harassed by the police. He provides a disturbing description of his father being captured and murdered by the Serbian army, forcing Rukiqi and his brother to flee to the mountains. In denying Rukiqi's motion to reopen, the BIA did not mention any of the affidavit evidence. Instead, both the IJ and the BIA relied on the United States Department of State Country Reports for Yugoslavia for 2000 and 2001 to say that changed conditions in Rukiqi's town show he would not be persecuted on his return. If this case were being remanded, as I believe it should be, the IJ and the BIA

feasance as the reason for Rukiqi's late filing.

**130**

may have ultimately decided, after weighing Rukiqi's evidence, that he was nevertheless not eligible for asylum. But, at least then his evidence would have been weighed; he would have had the legal process he was due. Ignoring Rukiqi's statements about his experiences in Kosovo, statements that are plainly relevant to the question of whether he has a reasonable fear of persecution, was, I believe, an abuse of discretion by the BIA.

I therefore dissent.